**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee*,

v.

WILLIAM AUBREY,
    *Defendant-Appellant*.

No. 13-10510

D.C. No.
2:09-cr-00206-
KJD-PAL-1

OPINION

Appeal from the United States District Court
for the District of Nevada
Kent J. Dawson, Senior District Judge, Presiding

Argued and Submitted
May 11, 2015—San Francisco, California

Filed September 8, 2015

Before: Diarmuid F. O'Scannlain, Sandra S. Ikuta,
and N. Randy Smith, Circuit Judges.

Opinion by Judge N.R. Smith

## SUMMARY[*]

### Criminal Law

The panel affirmed a conviction and sentence for two counts of conversion and misapplication of funds from a tribal organization, in violation of 18 U.S.C. § 1163.

The defendant is a contractor who owned a controlling interest in, and managed and controlled, two construction companies. His conviction resulted from his involvement in projects he performed for the Navajo Nation.

The panel held that for purposes of § 1163, funds paid from an Indian tribal organization to a contractor continue to be "property belonging to any Indian tribal organization," as long as the tribal organization maintains sufficient supervision and control of disbursed funds and their ultimate use. The panel held that a reasonable jury could find (a) that the funds misappropriated or converted by the defendant belonged to a tribal organization, even if the funds were considered reimbursement for work already completed; and (b) that the Navajo Housing Authority had sufficient supervision and control of the funds allocated to it by the U.S. Department of Housing and Urban Development pursuant to the Native American Housing Assistance and Self-Determination Act. The panel concluded that there was sufficient evidence for a rational jury to conclude beyond a reasonable doubt that the defendant was misappropriating the tribal funds.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the district court did not err by not requiring a prosecution witness, a forensic auditor with HUD's Office of Inspector General, to be certified as an expert; and that the district court did not abuse its discretion by allowing the witness's summary charts to be admitted into evidence. The panel held that the district court did not err in instructing the jury.

The panel held that the district court did not err in applying sentence enhancements for loss more than $1,000,000 but not more than $2,500,000 and abuse of trust.

## COUNSEL

Michael J. Kennedy (argued), Chief Assistant Federal Public Defender, Rene Valladares, Federal Public Defender, Reno, Nevada, for Defendant-Appellant.

Scott A.C. Meisler (argued), Sung-Hee Suh, Deputy Assistant Attorney General, and Leslie R. Caldwell, Assistant Attorney General, United States Department of Justice, Criminal Division, Appellate Section, Washington, D.C.; Daniel G. Bogden, United States Attorney, Elizabeth Olson White, Appellate Chief, Kathryn Newman and Adam McMeen Flake, Assistant United States Attorneys, Las Vegas, Nevada, for Plaintiff-Appellee.

## OPINION

N.R. SMITH, Circuit Judge:

For purposes of 18 U.S.C. § 1163, funds paid from an Indian tribal organization to a contractor continue to be "property belonging to any Indian tribal organization," as long as the tribal organization maintains sufficient supervision and control of disbursed funds and their ultimate use. Accordingly, we reject William Aubrey's contention that the evidence presented at his trial was insufficient to prove that he converted or misused property belonging to an Indian tribal organization in violation of 18 U.S.C. § 1163. We also deny Aubrey's other challenges to his conviction and sentencing.

## BACKGROUND[1]

### A. *Overview of the federal funding of tribal housing projects*

Under the Native American Housing Assistance and Self-Determination Act, 25 U.S.C. §§ 4101–4212 ("NAHASDA"), the U.S. Department of Housing and Urban Development ("HUD") allocates federal money to Indian tribes to fund the construction and maintenance of affordable housing on Indian reservations. HUD evaluates a tribe's specific needs and then

---

[1] Aubrey contends that there was insufficient evidence that he converted or misapplied housing grant funds that belonged to an Indian tribal organization or were entrusted to that organization's agents. Therefore, we present the facts "in the light most favorable to the prosecution." *United States v. Hicks*, 217 F.3d 1038, 1041 (9th Cir. 2000).

allocates money to the tribe, such funds are then termed a block grant.

The Navajo Nation receives the largest amount of NAHASDA block grant funds in the country. The Navajo Housing Authority ("NHA"), the Navajo tribal organization designated to receive the block grant funds from HUD,[2] received approximately ninety million dollars annually between the years of 2000 and 2004. To be eligible to receive NAHASDA block grant funds, the NHA must file an annual Indian Housing Plan to specify how the funds are to be used. Once the NHA's Housing Plan is approved by HUD, the NAHASDA funds are then allocated to the NHA. However, even after the funds are allocated, they are not immediately delivered to the NHA. Instead, the allocated funds are only released by HUD when the NHA submits requests, accompanied by supporting documentation, that eligible work under the Housing Plan has been performed. For example, after a roofer completes work on houses under the NHA's Housing Plan, the roofer submits a bill (either directly or through a contractor) to the NHA. The NHA then requisitions the funds from HUD, who releases the funds to the NHA in the form of a draw. Those funds must then be used to pay the subcontractor whose work supported the requisition (in this example, the roofer). The funds cannot be used for other purposes. In short, NAHASDA funds must be spent solely on work that is (a) eligible under the statute, (b) approved under the Indian Housing Plan, and (c) verified as completed by the responsible tribal organization. 25

---

[2] Tribal organizations, such as the NHA, authorized by tribal governments to receive grant funds and to provide assistance for affordable housing for Indians are known, under NAHASDA, as "tribally designated housing entities." 25 U.S.C. § 4103(22).

U.S.C. § 4111(g) ("[A]mounts provided under a grant under this section may be used only for affordable housing activities under subchapter II of this chapter that are consistent with an Indian housing plan approved under section 4113 of this title.").

NHA does not undertake all housing projects on the Navajo Nation Reservation on its own. Because of the Reservation's size and political diversity (the Reservation covers over 25,000 square miles and is divided into 110 chapters, which are comparable to county governments), the NHA delegated responsibility for requisitioning and disbursing NAHASDA funds to a number of sub-grantees. One such sub-grantee was the Fort Defiance Housing Corporation ("FDHC"). The FDHC was a non-profit organization (formed under the laws of the Navajo Nation) and was delegated responsibility for the administration of NAHASDA funds to provide housing to the Navajo people. FDHC signed formal sub-grant agreements with NHA, pledging to adhere to the annual Indian Housing Plans submitted by NHA and also to abide by the governing federal and Navajo Nation laws and regulations. In its sub-grant agreement, FDHC understood and agreed that NAHASDA block grant funds would be allotted "on a cost reimbursement basis" through HUD's line-of-credit system. To obtain NAHASDA funds, FDHC had to submit a standard requisition form (supported by relevant documents such as bills and invoices), identifying the funding-eligible work performed during the relevant period, requesting payment, and agreeing to return any excess funds. NHA inspectors would then verify that the claimed work had actually been completed and approve FDHC's request. Once the request was approved, HUD would release the NAHASDA funds to NHA, which would issue a check to FDHC. Once the funds

were in FDHC's possession, it had a fiduciary duty to manage the funds and to pay them to the party who had performed the work that formed the basis for the requisition.

## B. FDHC and Lodgebuilder's Relationship

William Aubrey is a contractor who owned a controlling interest in, and actively managed and controlled, two construction companies: Lodgebuilder, Inc., a Nevada for-profit corporation, and Lodgebuilder Management, Inc., a Montana corporation (collectively, "Lodgebuilder"). Aubrey has had a long history of building houses on Indian lands throughout the country. Aubrey's conviction, at issue in this appeal, resulted from his involvement in projects he performed for the Navajo Nation from 2000 to 2004.

Between 1996 and 2004, Lodgebuilder and FDHC entered into a series of development, construction, and consulting agreements for various projects throughout the Navajo Nation Reservation. In fact, Lodgebuilder's and FDHC's relationship became so intertwined that FDHC's Chief Operations Officer, Marcus Tulley, testified at trial that Aubrey, as the person managing and controlling Lodgebuilder, had the real authority over FDHC's finances and financial management. By mid-2002, FDHC's relationship with Lodgebuilder had raised red flags with HUD's Southwest Office of Native American Programs ("SWONAP"). SWONAP issued a report in August 2002 addressing various issues arising from that relationship, ultimately finding that FDHC was in violation of fiscal controls and was unable to substantiate that NAHASDA funds were being used solely for authorized purposes.

Notwithstanding those findings, FDHC entered into a renewed five-year agreement (the "Consultant Agreement") with Lodgebuilder in October 2002. The Consultant Agreement stated that Lodgebuilder would provide construction management services for FDHC's projects, including preparing the monthly payment requests for approval by FDHC and NHA, distributing the NAHASDA funds awarded to FDHC to the suppliers and contractors who performed the work, and securing the third-party funding needed to cover the full cost of the projects. As for Lodgebuilder's own compensation, the agreement specified that Lodgebuilder would be paid like the other companies that Lodgebuilder was regulating–on a line-item basis in accordance with NAHASDA cost guidelines.

## C.  The Chilchinbeto project

Two months after entering into the Consultant Agreement, NHA submitted its 2003 Indian Housing Plan to HUD. The Indian Housing Plan requested $9.374 million in NAHASDA funds for a housing development to be built in Chilchinbeto, Arizona during the 2003 fiscal year. This amount was in addition to $2.26 million in NAHASDA grant funds that had been allocated during the 2002 fiscal year to get the project started. In May 2003, the FDHC entered into a sub-grant agreement with NHA whereby the FDHC agreed to build 90 units at Chilchinbeto, utilizing the $11.6 million in allocated NAHASDA funds. As directed by the Consultant Agreement, FDHC delegated the management of the Chilchinbeto project to Lodgebuilder (and thereby to Aubrey).

Construction at Chilchinbeto began in the summer of 2003. Lodgebuilder prepared monthly requisition requests

that FDHC signed and submitted to NHA. NHA then verified that the work had been completed, drew funds from its HUD line of credit, and issued checks to FDHC. FDHC then issued checks to Lodgebuilder, which Aubrey endorsed and deposited into his joint money market account that he shared with his wife, Brenda Todd. Through the relevant periods of time, the NHA received $9,593,000 in NAHASDA funds, of which $9,164,573 was deposited into Aubrey's bank account.

Aubrey used his money market account both for professional payments on the Chilchinbeto job and for personal expenses.[3] Thus, once the funds were deposited into Aubrey's account, it became extremely difficult to trace how he was using the NAHASDA funds. He also transferred money from the joint account to another personal account to finance gambling debts and buy jewelry.

The commingling of NAHASDA funds with personal finances did not seem to prevent Aubrey from paying the subcontractors doing the work at Chilchinbeto during the early phases of the job. However, starting in the spring of 2004, Aubrey's longtime employee, Dale Rowton, heard complaints that contractors were not being paid for the work they had completed. After hearing the complaints, Rowton asked Aubrey if the contractors could be paid. Aubrey told Rowton not to release checks, because NHA had not paid Lodgebuilder on the requested draws. However, contrary to Aubrey's statement to Rowton, NHA had (with a few exceptions) paid all eligible work expenses listed in FDHC's requisitions totaling more than $9.1 million through June 2004. NHA's payments were for completed work, such as

---

[3] Both parties agree that Aubrey was not legally obligated to keep NAHASDA funds separate from his other funds.

site electrical work, flooring, and stucco work; however, Aubrey did not pay many of these companies.

The government points to the experience of Four States Electric as its clearest example of Aubrey's failure to use NAHASDA requisitioned funds for their designated purpose. In March 2004, Four States contacted Rowton to bid on electrical work at Chilchinbeto. Rowton accepted Four States's bid and signed a contract with the company on behalf of FDHC. Four States performed the agreed-upon work in March and April 2004 and submitted timely bills to FDHC. The ensuing requisitions reflected Four States's performance and requested the contracted bid of a total of $200,000 in NAHASDA funds for site electrical work. On each occasion, NHA issued checks containing the requested amounts to FDHC, which passed the funds to Aubrey. Aubrey, in turn, deposited those funds at his bank and moved them among his various accounts. Aubrey used the funds to pay personal expenses, including payments to two casinos totaling more than $100,000 in May 2004 and another $50,000 payment to the Paris Casino in June 2004. Yet neither FDHC nor Aubrey (on FDHC's behalf) paid Four States Electric.

After learning that FDHC failed to pay vendors and contractors at Chilchinbeto, NHA terminated FDHC's sub-grant agreement and investigated the whereabouts of the NAHASDA funds. When the finance officials were able to review Lodgebuilder's finances, NHA confirmed that Aubrey had failed to pay numerous contractors and vendors for their work at Chilchinbeto and could not verify all of Lodgebuilder's claimed expenditures as permissible. An audit (conducted in the course of FDHC's subsequent bankruptcy) determined that Lodgebuilder had received $11.6 million in NAHASDA funds for the Chilchinbeto project in

fiscal years 2002 and 2003, but that Lodgebuilder continued to owe $1,562,921 to vendors who had worked on the project. The audit also concluded that, because Lodgebuilder had received $11.6 million in NAHASDA funds but could only verify $7,098,659 in expenses for the project, Lodgebuilder should have had $4,501,341 in grant funds from which it could have paid the subcontractors.

## D.  Aubrey's Trial and Sentencing

In December 2012, a grand jury returned a second superseding indictment charging Aubrey with (among other counts) two counts (Counts Four and Five) of conversion and misapplication of funds from a tribal organization, in violation of 18 U.S.C. § 1163.

Aubrey's trial began on April 9, 2013, and continued for fifteen days.  One of the prosecution witnesses was James Hoogoian, a forensic auditor with the HUD's Office of Inspector General.  Hoogoian introduced a series of charts reflecting the movement of funds among Aubrey's business and personal accounts, following each NHA requisition payment between July 2003 and June 2004.  Hoogoian prepared the charts by reviewing multiple bankers' boxes worth of documents and tracking the series of transactions that consumed each deposit.  When questioned by the prosecutor, Hoogoian agreed that he followed a procedure "similar in concept" to the "last-in-first-out" accounting method.  Aubrey objected to Hoogoian's testimony, arguing that Hoogoian was testifying as an expert even though he had not been certified.  The government responded that Hoogoian was providing foundation for the charts to be introduced as summary exhibits under Federal Rule of Evidence 1006, which allows parties to "use a summary, chart, or calculation

to prove the content of voluminous writings . . . that cannot be conveniently examined in court." The district court admitted the exhibits over Aubrey's objection, and allowed Aubrey a continuing objection to the testimony. The court also denied Aubrey's subsequent motion for a mistrial.

After the government rested its case, Aubrey moved for a judgment of acquittal on Counts Four and Five pursuant to Federal Rule of Criminal Procedure 29(a). The district court subsequently denied the motion.

At the close of the trial, Aubrey objected to two of the court's proposed jury instructions. Proposed Jury Instruction No. Fifteen, which addressed Count Four, outlined in part:

> In order to convict defendant AUBREY of this offense, the government must prove each of the following elements beyond a reasonable doubt:
>
> *First*, that during the period from May 20, 2004, to on or about June 8, 2004, defendant Aubrey knowingly and wilfully converted to his own use or wilfully misapplied money or funds; and
>
> *Second*, that those funds or that money belonged to an Indian tribal organization or was intrusted to the custody or care of an agent of an Indian tribal organization.

Proposed Jury Instruction No. Sixteen, which was very similar, outlined in part:

> In order to convict defendant AUBREY of the offense charged in Count Five, the government must prove each of the following elements beyond a reasonable doubt:
>
> *First*, that on or about June 24, 2004, defendant AUBREY knowingly and willfully embezzled stole, converted to his own use or misapplied money or funds; and
>
> *Second*, that those funds or that money belonged to an Indian tribal organization or was intrusted to the custody or care of an agent of an Indian tribal organization.

Aubrey objected to these instructions on the basis that the instruction split the crime into two elements rather than three, as Aubrey had requested in his proposed instructions. When objecting, Aubrey's counsel explained his objection, reasoning:

> [T]he objection there would be that the . . . first element is the specific intent crimes. . . . [I]n this case it's either conversion or misapplication. Then not every conversion or misapplication is a crime under the statute. It has to be the money or funds belonging to an Indian Tribal Organization. And then the third element is the jury has to find as a matter of fact that it is an Indian Tribal Organization. So that's why I set it out in three elements.

Thus, Aubrey's requested jury instructions read, in relevant part:

Second, those monies and funds belonged to the Navajo Housing Authority and its subgrantee, Fort Defiance Housing Corporation, as agents of the Navajo Nation, rather than belonged to defendant William Aubrey or someone else; and

Third, the Navajo Housing Authority and its subgrantee Fort Defiance Housing Corporation were Indian tribal organizations.

The district court denied Aubrey's objection, reasoning that "the Court believes that the jury is adequately instructed with the combination instruction that includes a definition of Indian Tribal Organization later on in the instructions." Accordingly, the court gave its Proposed Instructions Nos. Fifteen and Sixteen. After deliberation, the jury found Aubrey guilty on Counts Four and Five. Aubrey renewed his Rule 29 motion, which the district court again denied.

On September 10, 2013, the district court sentenced Aubrey to imprisonment for fifty-one months, to be followed by three years of supervised release. In calculating Aubrey's sentence, the court applied a sixteen-level increase pursuant to the United States Sentencing Guidelines Manual ("U.S.S.G.") § 2B1.1(b)(1)(I) (2012) for loss more than $1,000,000 but not more than $2,500,000, and a two-level enhancement for abuse of trust pursuant to U.S.S.G. § 3B1.3. Aubrey appeals.

**DISCUSSION**

Aubrey presents four challenges to his conviction and sentence. First, Aubrey argues that the district court erred by

denying his motion for judgment of acquittal, because (a) payments for verified, certified, and approved construction progress do not belong to an Indian tribal organization or are not held in trust after they are paid out, and (b) there was insufficient evidence that Aubrey converted or misapplied housing grant funds. Second, Aubrey argues that the district court erred by admitting Hoogoian's testimony as summary testimony and by admitting the summary exhibits, because he was not certified as an expert witness. Third, Aubrey argues that the district court erred in its jury instructions by failing to adequately guide the jury's deliberations and omitting Aubrey's proposed theory of defense language. Fourth, Aubrey argues that the district court erred at sentencing by applying both the sixteen and two-level sentencing increases. We address each contention in turn.

## I.

Aubrey argues that the government failed to prove all of the elements of 18 U.S.C. § 1163. Section 1163 allows for the conviction of a person who:

> embezzles, steals, knowingly converts to his use or the use of another, willfully misapplies, or willfully permits to be misapplied, any of the moneys, funds, credits, goods, assets, or other property belonging to any Indian tribal organization or intrusted to the custody or care of any officer, employee, or agent of an Indian tribal organization[.]

Thus, the government had to prove (1) Aubrey knowingly and willfully embezzled, stole, converted to his own use, or

misapplied money or funds and (2) those funds or that money belonged to an Indian tribal organization or was intrusted to the custody or care of an agent of an Indian tribal organization.

We "review de novo the district court's denial of a Federal Rule of Criminal Procedure 29 motion for judgment of acquittal." *United States v. Wiggan*, 700 F.3d 1204, 1210 (9th Cir. 2012).

## A.  *Funds belonging to any Indian Tribal Organization*

Aubrey argues that the money he received from FDHC ceased being funds "belonging to any Indian tribal organization or intrusted to the custody or care of any officer, employee, or agent of an Indian tribal organization" when the funds were disbursed to him.  According to Aubrey, because the disbursements were made after work had been completed and verified by the NHA, those funds constituted reimbursement for the work he had already completed; the tribe could not accept completed work and also continue to own the funds it used to pay for the work.

Although creative, Aubrey's contention is not supported by legal authority.[4]  Instead, tribal disbursements continue to belong to the NHA, a tribal organization, for the purposes of 18 U.S.C. § 1163, because the tribe exercises supervision and control over the funds and their ultimate use even after they have been disbursed.

---

[4] Aubrey does not cite to any cases, Ninth Circuit or otherwise, to support this argument.

We have not previously defined what it means for funds to "belong[] to any Indian tribal organization." All of our cases dealing with § 1163 have either dealt with situations where a tribal official (who was intrusted funds as an agent of the tribe) embezzled those funds, *see, e.g.*, *United States v. Coin*, 753 F.2d 1510, 1510–11 (9th Cir. 1985); *United States v. Brame*, 657 F.2d 1090, 1091 (9th Cir. 1981), or where the defendant actually stole tribal property, *see United States v. Tidwell*, 191 F.3d 976, 978–79 (9th Cir. 1999) (dealing with the theft of tribal masks). In neither of these lines of cases did we evaluate what it meant for funds or property to "belong[] to any Indian tribal organization," because it was clear that the property at issue belonged to an Indian tribal organization.

At trial, the government specifically chose not to argue that Aubrey was an agent of the tribe who had been intrusted with tribal funds. The government admits as much in its appellate briefing, instead reasoning that "it is 'extremely unlikely' that the jury was confused as to the relevant 'agent' of the Navajo Nation when . . . the jury instructions listing the elements of the Section 1163 offense identified NHA and FDHC as the agents, and the government did not urge conviction on an Aubrey-as-an-agent theory."[5] Therefore, the government cannot rely on the entrustment language in § 1163 to support Aubrey's conviction, unless the government had previously argued that Aubrey misapplied and willfully converted funds while they were intrusted to the

---

[5] The jury instructions read, in relevant part, "defendant . . . did knowingly and willfully convert to his own use and misapply moneys and funds . . . intrusted to the custody and care of the Navajo Housing Authority and Fort Defiance Housing Corporation as agents of the Navajo Nation."

NHA and FDHC. The government has never made that contention. Instead, all of the government's contentions concerning Aubrey's misdeeds have to do with his use of the funds once they were disbursed to him. Therefore, for Aubrey's conviction to stand, the funds must have continued to belong to the NHA and FDHC after they were disbursed, when Aubrey willfully converted or misapplied them.

To determine the meaning of the phrase "belonging to any Indian tribal organization," we look to the ordinary meaning of the phrase "belonging to." *See Metro One Telecomms., Inc. v. C.I.R.*, 704 F.3d 1057, 1061 (9th Cir. 2012) ("When interpreting a statute, we must start with the language of the statute. Moreover, '[i]n the absence of an indication to the contrary, words in a statute are assumed to bear their ordinary, contemporary, common meaning.'" (alteration in original) (citations omitted)). "Belong" is commonly defined as "to be the property of a person or thing." *Belong*, Webster's New International Dictionary (3rd ed. 1993); *see also Belong*, Black's Law Dictionary (9th ed. 2009) (providing the same definition). Therefore, § 1163 criminalizes a defendant's "embezzl[ing], steal[ing], knowingly convert[ing] to his use or the use of another, willfully misappl[ying], or willfully permit[ing] to be misapplied" the property of an Indian tribal organization.

We have previously explored what it means to be "property of" in a related context. The general federal theft statute, 18 U.S.C. § 641 (upon which § 1163 was modeled), punishes:

> [w]hoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or

disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof[.]

*Id.*; *see Chilkat Indian Vill. v. Johnson*, 870 F.2d 1469, 1472 (9th Cir. 1989). When determining whether funds stolen or embezzled were "of the United States," we have held that this requirement was satisfied when the United States had "'title to, possession of, or control over' the funds involved." *See United States v. Kranovich*, 401 F.3d 1107, 1113 (9th Cir. 2005) (quoting *United States v. Faust*, 850 F.2d 575, 579 (9th Cir. 1988)). Further, we have "also looked to the amount of control the government has retained over funds when seeking to determine whether the funds are government funds within the purview of § 641." *Faust*, 850 F.2d at 579. In *United States v. Von Stephens*, we held that the federal government "has sufficient interest in its funds, even if commingled [with state and county funds], where it exercises supervision and control over the funds and their ultimate use." 774 F.2d 1411, 1413 (9th Cir. 1985) (per curiam).

We now adopt the standards from *Kranovich*, *Faust*, and *Von Stephens* for use in the § 1163 context. Tribal funds disbursed continue to be "property belonging to any Indian tribal organization" as long as the tribe maintains "title to, possession of, or control over them." *Kranovich*, 401 F.3d at 1113 (citation omitted). Thus, funds that have been disbursed, even as reimbursement for completed work, continue to belong to the tribal organization if the tribal organization "exercises supervision and control over the

funds and their ultimate use." *Von Stephens*, 774 F.2d at 1413.

Utilizing this standard, it is clear that the NHA exercised sufficient control over the grant funds to conclude that the funds belonged to the tribal organization. First, before grant funds could be released by HUD, NHA was required to verify that actual, reimbursable work had already been completed. To comply with this requirement, the NHA reviewed all documents and invoices submitted by FDHC and Aubrey, and conducted site inspections before any disbursements were made. Prior approval of fund disbursements indicates supervision and control. *See United States v. Johnson*, 596 F.2d 842, 846 (9th Cir. 1979) ("[U]rban funds granted to the agencies . . . should be utilized under the strictest of supervision, including submission by the union of verified payrolls before additional sums are advanced by the redevelopment agency."). Second, NHA's requisition form (the form submitted by Aubrey for all grant fund reimbursements) indicated NHA's continued interest in the funds. The requisition form required the following certification:

> I certify the data reported and funds requested on this voucher are correct and the amount requested is not in excess of immediate disbursement needs for this program. In the event the funds provided become more than necessary, such excess will be promptly returned (via NHA) as directed by HUD.

Thus, NHA's form made it clear that, even after funds were disbursed, NHA retained an interest in the funds. Third, the sub-grant agreement required FDHC (and

Aubrey/Lodgebuilder who, through the Consultant Agreement, stepped into FDHC's shoes with regard to managing the NAHASDA funds) to comply with NHA's policies and submit numerous reports to NHA. Additionally, the sub-grant agreement gave NHA the authority to audit and demand accountings from FDHC and its sub-grantees. The ability to audit and require periodic reporting indicates supervision and control. *See Von Stephens*, 774 F.2d at 1413 (reasoning that audit and reporting requirements, as well as power to examine fund recipient's bank accounts, constituted supervision and control); *United States v. Gibbs*, 704 F.2d 464, 465–66 (9th Cir. 1983) (per curiam) (finding supervision and control when periodic reports and audits were required). Trial testimony confirmed that NHA exercised its audit and investigation authority in response to Aubrey's suspected misuse of the grant funds. The testimony also confirmed that NHA eventually obtained records from Lodgebuilder in an effort to account for misappropriated funds. Taken together, a reasonable jury could find (a) that the funds misappropriated or converted by Aubrey belonged to a tribal organization, even if the funds were considered reimbursement for work already completed; and (b) that NHA had sufficient supervision and control of the NAHASDA funds.

## B. Sufficiency Challenge

Aubrey was convicted of two counts of embezzlement or misapplication under 18 U.S.C. § 1163. Count Four focused on the period from May 20, 2004 to June 8, 2004, and Count Five dealt with events on or about June 24, 2004. Aubrey argues that there was insufficient evidence to convict him of either Count. "In reviewing the sufficiency of the evidence, [the court] construe[s] the evidence in the light most

favorable to the prosecution, and then ask[s] whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Wiggan*, 700 F.3d at 1210 (quoting *United States v. Nevils*, 598 F.3d 1158, 1161 (9th Cir. 2010)) (internal quotation marks omitted). "Because the government does not need to rebut all reasonable interpretations of the evidence that would establish the defendant's innocence, or 'rule out every hypothesis except that of guilt beyond a reasonable doubt' . . . , a reviewing court may not ask whether a finder of fact could have construed the evidence produced at trial to support acquittal." *Nevils*, 598 F.3d at 1164 (quoting *Jackson v. Virginia*, 443 U.S. 307, 326 (1979)). Therefore, we focus on the evidence that, when taken in the light most favorable to the prosecution, supports Aubrey's conviction.

### 1. Aubrey's Count Four Conviction

Taken in the light most favorable to the prosecution, the non-payment of funds to Four States Electric presents sufficient evidence such that any rational trier of fact could have convicted Aubrey on Count Four. Four States performed the electrical work on the Chilchinbeto project in March and April 2004 and submitted timely bills to FDHC. The ensuing requisitions reflected Four States's performance and requested a total of $200,000 in NAHASDA funds for site electrical work. On each occasion, NHA issued checks containing the requested amounts to FDHC, which then passed the funds to Aubrey. Aubrey, in turn, deposited those funds in his bank account and moved them among accounts from which he paid personal expenses, including payments to two casinos totaling more than $100,000 in May 2004. Yet neither FDHC nor Aubrey (on behalf of FDHC) paid Four

States Electric. This pattern was repeated for many other subcontractors who worked on the Chilchinbeto project.

As discussed above, the NAHASDA funds distributed to Aubrey belonged to the NHA, a tribal organization, because it had the authority to supervise and control the funds even after they had been delivered to Aubrey. Witness testimony established that Aubrey was not free to use the NAHASDA funds as he saw fit, but was obligated to make sure they were delivered to the subcontractors who had requisitioned the funds. Despite the fact that funds had been delivered to Aubrey to pay Four States for its site electrical work, Four States never received payment from either Aubrey or FDHC. In the same period of time, Aubrey made large payments from the same account to satisfy his personal gambling debts. When combined with evidence that Aubrey lied when confronted about the non-payment, his conceded failure to put the NAHASDA funds to their designated purpose constitutes sufficient evidence that could allow a rational trier of fact to conclude, beyond a reasonable doubt, that Aubrey had embezzled or misapplied those funds.

Both at trial and before this court, Aubrey provided various alternative explanations for why he was authorized to retain NAHASDA funds for his own use. He argued that (1) he spent $690,000 of his own money for the Chilchinbeto project and was therefore entitled to keep the NAHASDA funds as reimbursement; (2) the government was not able to show that he was using NAHASDA funds to pay for his own personal expenses; and (3) the Chilchinbeto project was underfunded and the reason subcontractors were not getting paid was because of under funding, not misappropriation. However, none of these arguments explain why money paid to Aubrey (for the sole purpose of paying specific

subcontractors) never made it to the subcontractors. If Aubrey were paying the subcontractors from his own funds and then keeping the NAHASDA reimbursement funds as he claims, the subcontractors still would have been getting paid. Even if the project were underfunded, the subcontractors would have at least been paid up to the NAHASDA limit for their work, and they would only be unpaid to the extent that the NAHASDA funds were insufficient to cover their submitted invoices. Instead, the evidence showed that NAHASDA funds were being used by Aubrey, and subcontractors were not receiving payment. This evidence was sufficient to allow any rational jury to conclude, beyond a reasonable doubt, that Aubrey was misappropriating the tribal funds.

### 2. Aubrey's Count Five Conviction

Count 5 dealt with payments delivered to Aubrey in June 2004. The evidence showed that (1) FDHC requested $133,700 in payment for work prior to June 1 on streets ($84,000), site electrical ($36,000), and gutters ($13,000); (2) NHA issued a check in the requested amount; (3) Aubrey deposited the check into an FDHC account at his bank on June 21, 2004; and (4) the next day, Aubrey transferred $45,000 from that FDHC account to the joint Aubrey-Todd account. Two days later, on June 24, Aubrey cut a $50,000 check to the Paris Casino from his separate personal account, and the bank covered that check by sweeping in $25,400 attributable to the recently deposited grant funds. These actions followed Aubrey's pattern of depositing grant money into his personal accounts and then, within days, paying out large-scale expenses. Taken in the light most favorable to the prosecution, this evidence supported the jury's reasonable inference that Aubrey was putting grant funds earmarked for

another purpose to his personal use or was, at the very least, misappropriating the funds to the payment of parties other than the subcontractors whose invoices supported the requisitions.

Once again, although Aubrey presents alternative explanations for why he was entitled to keep the funds requisitioned in June, the jury heard his explanations and rejected them. Because sufficient evidence was presented to support his conviction, the district court did not err in denying Aubrey's Rule 29 motion for acquittal.

## II.

Aubrey argues that (1) the district court erred by not requiring Hoogoian to be certified as an expert witness and compelling expert disclosures, and (2) the district court erred by allowing Hoogoian's summary charts to be admitted into evidence.

### A.  Expert Certification

A trial court's decision to admit or exclude expert testimony is reviewed for abuse of discretion. *United States v. Gonzales*, 307 F.3d 906, 909 (9th Cir. 2002); *United States v. Laurienti* (*Laurienti I*), 611 F.3d 530, 547 (9th Cir. 2010). Under the abuse of discretion standard, if the district court identified the correct legal rule, then its ruling must be affirmed unless the "court's application of the correct legal standard was illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *United States v. Redlightning*, 624 F.3d 1090, 1110 (9th Cir. 2010).

Aubrey argues that the district court was required to certify Hoogoian as an expert witness, solely because of his use of the "last-in-first-out" accounting method in preparing his summary charts. Aubrey cites to no authority to support this contention. Rather, he argues broadly that "'last-in-first-out' is neither a Federal Rule of Evidence 1006 summary nor an example of lay witness opinion proper under Federal Rule of Evidence 701."

In addressing Aubrey's objection and motion for mistrial, the court ruled:

> I don't think anything that he's testified to would call for expert opinion testimony or involve expert opinion testimony under 702. All of his testimony's been under 701, lay–laywitness testimony. And he may be an expert, but he hasn't testified as an expert. He's testifying to facts of which he had personal knowledge. And he [is] subject to cross-examination on his . . . conclusions as to what those expenses were. . . . [P]ersonal knowledge would include his own investigation as to the payees and he's subject to cross-examination on that. Personal knowledge as to the checks that he saw.

The court then asked whether all of the source material, on which Hoogoian was basing his testimony, had been provided to Aubrey. Aubrey answered, "It was produced in discovery." Further, when the government asked Hoogoian about other forms of analysis that he may have used when creating his summary, the district court recognized that the question was "get[ting] into the area of kind of dealing with

expert testimony" and prevented the government from pursuing that line of questioning.

Hoogoian was not required to be certified as an expert. Hoogoian testified about his own personal investigation of FDHC and Lodgebuilder in his capacity as a HUD auditor in accordance with Federal Rule of Evidence 701. Although Hoogoian might have been eligible to be certified as an expert, the district court properly restricted his testimony to the areas in which he had personal knowledge (the documents, investigation, and the methods he used to prepare his summary) and prevented him from providing in-depth analysis of various accounting methods. Simply because Hoogoian stated that he used "last-in-first-out" to construct his summary charts did not transform his testimony into expert testimony. Instead, Hoogoian was merely providing foundation for the evidence he was presenting. Further, when Hoogoian was prompted by the prosecution to discuss the merits of the "last-in-first-out" accounting method, the district court properly prevented Hoogoian from answering, as that sort of testimony could stray into the realm of expert testimony. Accordingly, two passing references to the "last-in-first-out" method (when explaining his own procedure in constructing the charts) is not sufficient to require the district court to certify Hoogoian as an expert witness. *See Teen-Ed, Inc. v. Kimball Int'l, Inc.*, 620 F.2d 399, 403 (3d Cir. 1980) ("The fact that Zeitz might have been able to qualify as an expert witness on the use of accepted accounting principles in the calculation of business losses should not have prevented his testifying on the basis of his knowledge of appellant's records about how lost profits could be calculated from the data contained therein.").

## B.  Summary Evidence

"It is long established that, where records are voluminous, a summary,  either oral or written, may be received in evidence." *Sam Macri & Sons, Inc. v. U.S. for Use of Oaks Const. Co.*, 313 F.2d 119, 128–29 (9th Cir. 1963).  However, the summary must meet the requirements of Rule 1006.  *See Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 515 n.9 (9th Cir. 1985) (holding that a "self-calculated" and "unverified" summary was properly admitted when the underlying records supporting the summary were made available to the other party and where the party was given "ample opportunity to cross-examine" the person who oversaw the preparation of the summary).  Rule 1006 requires that "[t]he proponent must make the originals or duplicates [of the voluminous writings] available for examination or copying, or both, by other parties at a reasonable time and place."  We review for abuse of discretion "a district court's admission of summary evidence." *United States v. Anekwu*, 695 F.3d 967, 981 (9th Cir. 2012).

When preparing his summary testimony and charts, Hoogoian sifted through multiple bankers' boxes worth of documents concerning deposits and withdrawals from Aubrey's bank accounts.  Under the plain language of Rule 1006, the government was permitted to "use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court."  Multiple bankers' boxes of bank statements constitute the type of materials anticipated by Rule 1006.  Further, the district court ensured that the government made the documents underlying the summary available to Aubrey, as Aubrey admitted they had done.

Therefore, nothing suggests that the government failed to satisfy Rule 1006.

The district court did not abuse its discretion by allowing Hoogoian's summary charts to be admitted into evidence. In *United States v. Rizk*, we held that summary evidence is admissible as evidence if "the underlying materials upon which the summary is based (1) are admissible in evidence and (2) were made available to the opposing party for inspection." 660 F.3d 1125, 1130 (9th Cir. 2011). Additionally, in *Anekwu*, we noted that "we have not articulated a bright-line rule against admission of summary charts as evidence." 695 F.3d at 981–82 (citation and alterations omitted). In fact, the district court has "discretion under Federal Rule of Evidence 611(a) to admit summary exhibits for the purpose of assisting the jury in evaluating voluminous evidence." *Id.* at 982 (citation and alterations omitted). We further concluded in *Anekwu* that "we need not embrace or condemn the procedure followed by the district court," because "the error is harmless given admissibility of the underlying data, lack of objection to accuracy of the summary, and the limiting instruction." *Id.* (citation omitted).

Aubrey never objected to the accuracy of the summaries at trial. Instead, he merely objected to Hoogoian's testimony, because he thought that Hoogoian should have been required to be certified as an expert. On appeal, Aubrey now argues that admission of the summary charts into evidence was error. However, the underlying bank account records were admissible[6] and delivered to Aubrey in discovery. Therefore, under *Rizk*, the district court did not abuse its discretion in allowing the summary charts to be entered into evidence.

---

[6] Aubrey has not argued that the records were inadmissible.

Further, even if admitting the summary charts into evidence were error, that error was harmless under *Anekwu*. The district court provided the Ninth Circuit's Pattern Instruction 4.16 (as a limiting instruction) that said "[c]ertain charts and summaries have been admitted in evidence," those "[c]harts and summaries are only as good as the underlying supporting material," and jurors should "give them only such weight as you think the underlying material deserves." Therefore, "given [the] admissibility of the underlying data, lack of objection to [the] accuracy of the summary, and the limiting instruction," any error was harmless. *See Anekwu*, 695 F.3d at 82.

## III.

Aubrey argues that the district court erred by providing a jury instruction containing the language, "Second, those funds or that money belonged to an Indian tribal organization or was intrusted to the custody or care of an agent of an Indian tribal organization." Aubrey argues that the district court should have instead used his proposed instruction that read, "Second, those monies and funds belonged to the Navajo Housing Authority and its subgrantee Fort Defiance Housing Authority, as agents of the Navajo Nation, *rather than belonged to defendant William Aubrey or someone else*." On appeal, Aubrey argues that the given jury instruction (1) failed to address his theory of defense that the NAHASDA funds belonged to Aubrey or subcontractors, not the NHA or FDHC, and (2) allowed the jury to convict Aubrey under an agency theory. At trial, although Aubrey objected to the instruction, his objection merely argued that the instruction should have been split into three elements instead of two. He did not object on the ground that the instruction did not cover his theory of defense. Because

Aubrey failed to "state with adequate specificity the grounds for an objection to a jury instruction before the jury retires," we review this claim for plain error.[7] *United States v. Hofus*, 598 F.3d 1171, 1175–76 (9th Cir. 2010).

"A defendant is entitled to have the judge instruct the jury on his theory of defense, provided that it is supported by law and has some foundation in the evidence." *United States v. Mason*, 902 F.2d 1434, 1438 (9th Cir. 1990), *overruled on other grounds by Dixon v. United States*, 548 U.S. 1 (2006). "[B]ut it is not reversible error to reject a defendant's proposed instruction . . . if other instructions, in their entirety, adequately cover the defense theory." *Id.*

The district court did not err by giving its jury instruction rather than Aubrey's proposed instruction. The jury instructions adequately covered Aubrey's theory of defense. Section 1163 allows for a conviction if the defendant "embezzles, steals, knowingly converts to his use or the use of another, willfully misapplies, or willfully permits to be misapplied," funds "belonging to any Indian tribal organization or intrusted to the custody or care of any officer, employee, or agent of an Indian tribal organization." The jury instruction provided by the court followed the statute closely. The court's jury instructions then defined conversion, willful misapplication, embezzlement, and stealing. Each of these definitions included the phrase "of another" or "belongs to another." Thus, under the instructions provided by the court, it would have been clear

---

[7] To satisfy the plain error standard of review, "[t]here must be an 'error' that is 'plain' and that 'affect[s] substantial rights.'" *United States v. Olano*, 507 U.S. 725, 732 (1993) (quoting Fed. R. Crim. Proc. 52(b)) (second alteration in original).

to the jury that it could not convict Aubrey if it found that the funds belonged to him.  The instructions also provided that Aubrey could not be convicted if the jury found that the funds belonged to the subcontractors.  Instructions fifteen and sixteen only allowed for Aubrey's conviction if the jury found that the funds "belonged to an Indian tribal organization or was intrusted to the custody or care of an agent of an Indian tribal organization."  Under the plain meaning of this instruction, if the jury found that the funds belonged to subcontractors, it could not convict Aubrey, because then the funds would not belong to a tribal organization.  Nothing would be gained by adding Aubrey's proposed language "rather than belonged to defendant William Aubrey or someone else."  Therefore, the district court did not err by providing the instructions it did to the jury.  *See United States v. Keyser*, 704 F.3d 631, 641–42 (9th Cir. 2012) ("[A] defendant is entitled to have his theory fairly and adequately covered by the instructions, but is not entitled to an instruction in a particular form.").  Without error, there can be no plain error.

The court's jury instruction also did not allow Aubrey's conviction on an improper agency theory.  Section 1163 expressly allows conviction if the jury finds that the funds were intrusted to an agent of an Indian tribe.  The jury instructions provided by the court specifically identified "the Navajo Housing Authority and Fort Defiance Housing Corporation as agents of the Navajo Nation."  Therefore, the jury would have reasonably understood that NHA and FDHC were the applicable agents under instructions fifteen and sixteen.  The jury instructions were not "misleading or inadequate to guide the jury's deliberations," because they properly stated the law and expressly identified the basis upon which the government sought conviction.  *See United*

*States v. Johnson*, 680 F.3d 1140, 1147 (9th Cir. 2012) (quoting *United States v. Holmes*, 229 F.3d 782, 786 (9th Cir. 2000) (internal quotation marks omitted)). Thus, the district court did not commit error, plain or otherwise, in providing the jury the instructions that it did.

**IV.**

Aubrey challenges two sentencing enhancements that the district court imposed: (1) a sixteen-level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(I) for loss more than $1,000,000 but not more than $2,500,000; and (2) a two-level enhancement for abuse of trust pursuant to U.S.S.G. § 3B1.3.

## A. Sixteen-level increase

We review a district court's factual calculation of the amount of loss under the Guidelines for clear error. *United States v. Stargell*, 738 F.3d 1018, 1024 (9th Cir. 2013). "A reviewing court must ask whether, 'on the entire evidence,' it is 'left with the definite and firm conviction that a mistake has been committed.'" *Id.* (alterations omitted) (quoting *Easley v. Cromartie*, 532 U.S. 234, 242 (2001)).

Looking at all of the evidence in this case, the district court did not clearly err by finding a loss more than $1 million, but not more than $2.5 million. When making its sentencing determination, the district court pointed to two measures, both of which indicated a loss greater than $1 million but less than $2.5 million. The district court reasoned:

> I have concluded that because of the failure to pay contractors for whom funds had been

requisitioned, there was a cascade of consequences including the fact that NHA had to take steps at that point–once they learned that at least one contractor hadn't been paid with requisition monies, they had to pull the plug, and that caused consequential damages that exceeded $1 million.  The NHA figure is 2.2 million.

The district court then noted that it "put some stock in Hoogoian['s] analysis, but [it didn't] rest [its] decision entirely on that in finding that the loss amount was more than $1 million but less than $2,500,000."  Hoogoian's analysis indicated that $1,989,339 of NAHASDA funds were spent for Aubrey's personal use.  Other evidence, presented at trial also supports the enhancement.  The FDHC bankruptcy audit indicated that Lodgebuilder owed $1,562,921 to contractors who had worked on the Chilchinbeto project and that Lodgebuilder should have had access to $4,501,341 in allocated NAHASDA grant funds to pay those contractors.  However, the NAHASDA funds were not used for their designated purpose.  Thus, even though Aubrey presents alternative theories about why the amount of loss should be less, the district court's finding is not clearly erroneous.  *See United States v. Reed*, 80 F.3d 1419, 1424 (9th Cir. 1996) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.") (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985)).

**B.  Two-level enhancement**

The Guidelines prescribe a two-level enhancement "[i]f the defendant abused a position of public or private trust . . .

in a manner that significantly facilitated the commission or concealment of the offense."  U.S.S.G. § 3B1.3.

As a preliminary matter, we first address Aubrey's contention that the enhancement in § 3B1.3 cannot apply in his case, because an abuse of trust or skill is included in the offense of his conviction.  We review this argument de novo, because it involves interpretation § 3B1.3 of the Sentencing Guidelines.  *See United States v. Gomez-Leon*, 545 F.3d 777, 782 (9th Cir. 2008).  Section 3B1.3 provides:

> If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels.  This adjustment may not be employed if an abuse of trust or skill is included in the *base offense level* or specific offense characteristic.

(emphasis added).  According to Aubrey, the second sentence of § 3B1.3 precludes its application to his case, because the offense he was convicted of included "an abuse of trust or skill."  However, Aubrey misinterprets § 3B1.3.  In *Laurienti I*, this court clarified, "The [abuse-of-trust] enhancement is inapplicable only if the *base offense level* necessarily includes an abuse of trust, regardless whether the defendant's *offenses of conviction* include an abuse of trust."  611 F.3d at 556 (alteration in original).  Therefore, it is the base offense level that matters, not the offense of conviction.  Here, the base offense level of Aubrey's charges was derived from U.S.S.G. § 2B1.1.  In *United States v. Ajiboye*, we held:

>Ajiboye was assigned a base offense level of
>4 under Section 2B1.1(b)(1) ("Larceny,
>Embezzlement, and Other Forms of Theft").
>This provision of the Guidelines does not
>include "an abuse of trust or skill" in it.
>Ajiboye's two-level enhancement for abuse of
>a position of trust thus cannot be attacked on
>that basis.

961 F.2d 892, 895 n.4 (9th Cir. 1992). Under *Ajiboye*, the
base offense level in Section 2B1.1 does not include an abuse
of trust or skill. Therefore, Aubrey's preliminary argument
fails.

We now address the district court's application of § 3B1.3
to the facts of Aubrey's case. We review a district court's
application of an abuse-of-trust enhancement under a two-
step analysis. *See United States v. Laurienti* (Laurienti II),
731 F.3d 967, 973 (9th Cir. 2013). First, we determine
"[w]hether a defendant acted from a 'position of trust' as
defined by the Guidelines" under de novo review. *Id.* Then,
"[i]f we decide that the defendant held a position of trust, we
review for clear error the [district] court's decision whether
the defendant's abuse of his position significantly facilitated
the offense." *Id.*

Turning to the first step of the "abuse of trust" analysis,
Aubrey was in a position of trust. "[T]he presence or lack of
'professional or managerial discretion' represents the decisive
factor in deciding whether a defendant occupied a position of
trust." *Id.* (quoting *United States v. Contreras*, 581 F.3d
1163, 1166 (9th Cir. 2009)). "A defendant has this discretion
when, because of his or her special knowledge, expertise, or
managerial authority, he or she is trusted to exercise

substantial discretionary judgment that is ordinarily given considerable deference." *Id.* (citation and alterations omitted). Aubrey argues that "[w]hile [he] had professional and managerial discretion with respect to his private for-profit company Lodgebuilder, he did not have that same position within FDHC or NHA to warrant this enhancement." This argument is contradicted by the evidence presented at trial. Trial evidence supported the conclusion that FDHC delegated financial management of the Chilchinbeto project to Aubrey's company, that his company then stepped into the shoes of FDHC, and that Aubrey had "the real authority" at FDHC, because he "handle[d] all of the finances." The district court looked at these facts and concluded:

> This case is more than a simple case of misapplication. It involves a person who was really controlling the entire operations of a nonprofit and combining millions of dollars in–running millions of dollars through a personal account, combining it with trust monies, and then gambling and doing the other things that were evidenced during the trial.

Reviewing the evidence of this case de novo, we conclude that the district court did not err by concluding that Aubrey occupied a position of trust.

Under the second prong, the district court found that Aubrey's position of trust facilitated the crime. This finding is reviewed for clear error. *Id*. We conclude that the district court's finding was not clearly erroneous. The evidence showed that FDHC handed Aubrey millions in grant funds and exercised little oversight as he shifted the funds among

the various accounts he controlled. In fact, Aubrey (rather than FDHC) controlled the FDHC's financial records sought by NHA officials when they started investigating the reported non-payments. That FDHC really had no idea what Aubrey was "up to" indicates that he was in a position of trust and used that position to facilitate or conceal the mismanagement of the NAHASDA grant funds. Thus, we conclude that the district court's finding that Aubrey's position of trust facilitated the commission of this crime was not clearly erroneous.

**AFFIRMED.**