PAEZ, Circuit Judge,
dissenting:
I do not agree with the majority that the enhancement for abuse of trust under United States Sentencing Guideline § 3B1.3 applies to Adebimpe and Sog-bein’s (“defendants”) position as durable medical equipment (“DME”) suppliers in the Medicare program. In my view, DME suppliers do not exercise substantial professional or managerial discretion within Medicare’s reimbursement scheme because Medicare’s rules and regulations confine them to a ministerial role and leave all critical determinations of medical need to the beneficiary’s physician. I recognize that our sister circuits are divided on this issue, compare United States v. Willett, 751 F.3d 335 (5th Cir.2014) (upholding application of abuse-of-trust enhancement to DME supplier) with United States v. Garrison, 133 F.3d 831 (11th Cir.1998) (rejecting application of the enhancement to a supplier), but I find the Eleventh Circuit’s approach most persuasive. Therefore, I respectfully dissent from the majority’s decision to affirm the district court’s application of the abuse-of-trust enhancement.
I.
In United States v. Contreras, we reevaluated our precedent on the abuse-of-trust enhancement in light of the U.S. Sentencing Commission’s revisions to the commentary accompanying section 3B1.3. 581 F.3d 1163 (9th Cir.2009), opinion adopted in part, vacated in part on other grounds, 593 F.3d 1135 (9th Cir.2010) (en banc). In Contreras, we held that the Ninth Circuit’s prior emphasis on a defen *1225 dant’s “freedom to commit a difficult-to-detect wrong” was “incompatible” with section 3Bl.l’s revised commentary, which made the presence-of substantial “professional or managerial discretion” the key inquiry. Id, at 1165-66. In so concluding, we rejected the district court’s application of the enhancement to Contreras, a prison cook who took advantage of the fact that she “could enter the prison without being searched” to smuggle drugs to inmates. Id. at 1168. This fact alone “did not demonstrate the necessary discretion” to justify the enhancement, and the. court expressed concern that “to hold otherwise would extend § 3B1.3 to virtually every employment situation.” Id. (internal quotation marks and alterations omitted). As detailed below, the evidence at trial outlining the role of DME suppliers does not demonstrate that they exercisé the type of discretion the abuse-of-trust enhancement seeks to capture as interpreted by our opinion in Contreras.
II.
The process by which Medicare reimburses a DME supplier for a power wheelchair is carefully outlined in a document known as the Power Mobility Device Local Coverage Determination (LCD).[1] According to the LCD, the first step is the completion of a “face-to-face examination” between the physician and patient. The physician must document the results of the examination in a detailed report, which “should be tailored to the individual beneficiary’s condition,” “paint a' picture of the beneficiary’s functional abilities and limitations on a typical day,” and generally “contain as much objective data as possible.”
If, after the examination, the physician believes that the patient requires a power mobility device, she must complete a- “7-Element Order.” As the name suggests, these orders have seven specific requirements:
1. Beneficiary’s name
2. Description of "the item that is ordered. [ ]
3. Date of the face-to-face examination
4. Pertinent diagnoses/conditions that relate to the néed for the POV or power wheelchair
5.' Length of need'
6. Physician’s signature
7. Date of physician signature
Although the DME supplier “may provide a template order listing the seven required elements,’’ the supplier is expressly “prohibited from completing any part of it.” Only the physician who conducted the examination may prepare .the order, which the supplier must receive within forty-five days of the, face-to-face examination.
Relying on the physician’s order, the supplier prepares a “detailed product description.” Although the supplier selects the “specific power mobility device that is appropriate” based on the order, the options are narrowly confined by specific medical 'requirements. For example, a separate “Wheelchair Seating” LCD provides that a “skin protection seat cushion” is covered only if the beneficiary has one of several specific medical conditions (e.g., a “current pressure ulcer”) that the physician diagnosed.[2] Moreover, final approval of the specific device selected rests with the physician, who “must sign and date the detailed product description and the supplier must receive it prior to delivery.”
As a final step, “[pjrior to or at the time of delivery” of the power mobility device, “the supplier or practitioner must perform *1226 an onsite evaluation of the beneficiary’s home to verify that • the beneficiary can adequately maneuver the device that is provided considering physical layout, doorway width, doorway thresholds, and surfaces.” In other words, Medicare requires confirmation that the device is compatible with the beneficiary’s home.
Once this process is complete, the DME supplier submits the claim to Medicare for payment. The supplier must add one of four “modifier” codes to the claim submission: KX, GA, GY, and GZ. The GA. and GZ modifiers are used where there is “an expectation of a medical necessity denial,” while the GY modifier is required when the power mobility device is “only needed for mobility outside the home.” This leaves the KX modifier as the only option when the DME supplier seeks reimbursement for a power wheelchair used within the home and “all of the coverage' criteria specified in" [the] LCD have been met.”
III.
Unlike the majority, I do not view the DME supplier’s role in this process as “characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference).” U.S.S.G, § 3B1.3 cmt. n. 1. Most importantly, the supplier is not responsible for “determining the need for the equipment they provide.” Majority Opinion (“Maj. Op.”) at 1214. Rather, the supplier verifies that the physician has followed the LCD process by conducting the face-to-face-evaluation and completing the 7-Element Order. In essence, the supplier compares the physician’s order with- the detailed checklist laid out in the LCD. This does not reflect substantial professional or managerial discretion.[3] Furthermore, any add-ons the supplier might suggest for the device must fit within the parameters of the medically-specific LCD and must be approved for medical need by the physician. Although the supplier may have “some “wiggle room’ ” when matching the device to the beneficiary’s size and weight, Maj. Op. at 1222-23, 'wiggle room does not rise to the level of the substantial discretion envisioned by the Guidelines.' Nor does the supplier’s performance of a home visit confer the type of substantial discretion envisioned by the Guidelines. Although some experience with the power mobility devices’ sizes and functionality may be helpful, verifying “that the beneficiary can adequately maneuver the device that is provided considering physical layout, doorway width, doorway thresholds, and surfaces” is not a decision that requires “professional or managerial discretion,” let alone substantial discretion. Finally) the fact that suppliers must “personally certify the validity of their claims to Medicare” is not a discretionary decision when the supplier has to select the KX modifier in order to receive reimbursement. Although Medicare may rely on the honesty of DME suppliers who enter KX on their claims, such reliance does not transform the decision to enter that code into a discretionary one. A decision not tp seek reimbursement be *1227 cause the coverage criteria are not satisfied is not discretionary; it is the only decision allowed under the LCD.
The majority’s attempts to magnify the role of a DME supplier do not accurately reflect the LCD requirements or the testimony at trial. For example, the majority describes Jody Whitten, the Noridian representative, as testifying that “medical equipment suppliers have a responsibility to determine the medical necessity of power wheelchairs[.]” Maj. Op. at 1215. But Whitten never said that the supplier determines medical need; rather, she testified that the supplier has to “verify and collect medical records, verify all the orders and Detailed Product Descriptions are received in a timely manner, and verify that .the home provides enough room.” This verification is important, but it is ministerial in nature — only the physician is entrusted with the discretionary medical need determination under the LCD regulations. Nor does the supplier exercise professional discretion by sometimes producing, upon Medicare’s request, physician notes to corroborate laboratory results, diagnostic tests, or the findings of the physician’s face-to-face examination. Maj. Op. at 1222.
Similarly, the majority points to the testimony of Dr. John Fullerton, the government’s Medicare expert, who stated that a supplier can “absolutely” question a physician’s order because both have an “independent responsibility ... to get it right.” When pressed, however, on the supplier’s so-called “independent responsibility,” Dr. Fullerton stated only that the supplier must “look[ ] back at the physician and get[] physician records.” He acknowledged that “ultimately, it’s the physician who’s responsible for signing off on the type and .the accessories” for a power wheelchair.
The majority’s analysis is also flawed because it relies on the defendants’ fraudulent behavior to establish that they occupied a position of trust. For example, the majority explains that “Sogbein was not merely processing prescriptions written by Dr. Calaustro; rather, he was affirmatively instructing his co-conspirators to help him deliver a specific, high-cost piece of equipment he selected.” Maj. Op. at 1220. But the fact that Sogbein directed Dr. Calaustro to write prescriptions regardless of medical need is the fraudulent conduct for which he was convicted. By instructing Dr. Calaustro, he went beyond his authority as a supplier and usurped the discretion that Medicare gives to physicians. This is grounds for a fraud conviction, but not for the enhancement. Similarly, as further evidence of supplier discretion, the majority points to Dr. Fullerton’s testimony .that if a DMÉ supplier receives the kind of “woefully inadequate” documentation for an order that Dr. Ca-laustro provided, the supplier should request more documentation rather than deliver the order. Maj. Op. at 1216. Again, however, defendants’ failure to request additional documentation was part of the underlying fraud in this case, rather than a legitimate exercise of discretion approved of by Medicare.
To apply the abuse-of-trust enhancement, there must be more than a modicum of discretion — there must be substantial professional or managerial discretion inherent in the role occupied by the defendant. See Contreras, 581 F.3d at 1168. That discretion is absent here. Medicare has carefully circumscribed DME suppliers’ role in the supplying of power mobility devices, entrusting the critical, discretionary decisions to physicians that have the professional skill and training to determine a beneficiary’s medical need. Verifying the physician’s order, confirming, the device is usable in the beneficiary’s home, *1228 and applying the KX modifier to indicate that all Medicare criteria have been met, while important tasks for the processing of power mobility device claims, are ministerial in nature and do not require substantial discretionary judgment as required by section 3B1.3.
IV.
A.
Every Ninth Circuit case that has affirmed the application of the enhancement involved a defendant with substantial discretion that went well beyond the ministerial tasks that Medicare delegates to suppliers. In United States v. Laurienti, we affirmed the enhancement as applied to a stock broker based on the “professional discretion Laurenti exercised in selecting which securities to recommend, and the deference his recommendations received in light of his special knowledge and' expertise” in the field. 731 F.3d 967, 974 (9th Cir.2013). Laurenti’s provision of “investment advice” and ability to “identify securities that would further his [client’s] objectives,” id., is a far cry from defendants’ obligation to verify that each physician report contains Medicare’s seven required elements and that each beneficiary’s home is large enough to accommodate a power wheelchair.
Nor is the supplier’s role comparable to the ’ defendant’s in United States v. Aubrey, 800 F.3d 1115 (9th Cir.2015). In that case, the defendant “controlled] the entire operations of a non-profit” that constructed housing projects on the Navajo Nation Reservation.[4] Id. at 1134. While managing those projects, he improperly “shifted” HUD funds “among the various accounts he controlled” with “little oversight” by FDHC, the sub-grantee that supervised Aubrey’s work and reimbursed his expenses. Id. Given those facts, we concluded that Aubrey occupied a position of trust with FDHC. Id. Here, by contrast, Medicare exercises significant “oversight” over DME suppliers through the LCD rules, which dictate every step the supplier must take to obtain reimbursement. DME suppliers simply do not exercise the type of freedom in- processing power mobility device claims that Aubrey enjoyed over the management of the affordable housing developments. Further, .the discretion vested in defendants over the internal operations ■ of their businesses “carries] ho special weight” because that discretion is unrelated to the Medicare claims reimbursement ■ process governed by the LCD. United States v. West, 56 F.3d 216, 221 (D.C.Cir.1995)
In the Medicare fraud context, we have determined that physicians occupy a position of trust. United States v. Rutgard, 116 F.3d 1270 (9th Cir.1997). This result is unsurprising given that physicians' are explicitly listed in the Guidelines commentary as having the requisite professional discretion to justify the enhancement. Both the patient and Medicare are “easily taken advantage of if the doctor is not honest,” id. at Í293, because a physician’s specialized knowledge allows for obfuscation of wrongdoing. Absent hiring government physicians to re-examine beneficia *1229 ries, Medicare has no way to verify that the determinations of medical need are accurate. DME suppliers, by contrast, have the opportunity to commit fraud not because of any professional discretion or expertise, but because the volume of claims submitted to Medicare means the government must rely on supplier certifications and random audits as a check on fraudulent billing.
B.
Other circuits have recognized that specific statutory obligations do not confer substantial discretion. In United States v. Garrison, the Eleventh Circuit refused to apply the enhancement to a DME supplier convicted of Medicare fraud. 133 F.3d 831 (11th Cir.1998). The court held that Medicare’s “statutory reporting requirements do not create a position of trust” in the supplier, id. at 841, and distinguished Garrison’s lack of discretion from the hypothetical “physician who possesses the expertise to create erroneous medical records and, consequently, fraudulent Medicare reports that are difficult to detect and to question,” id. at 842. The majority holds that Garrison is distinguishable from this case because there the defendant submitted claims to a “fiscal intermediary whose specific responsibility was to review and approve requests for Medicare reimbursement.” Id. at 841; Maj. Op. at 1218-19, 1220-21. But even if the fiscal intermediary in Garrison had a larger role than Noridian did here, that still leaves the Eleventh' Circuit’s persuasive reasoning that suppliers simply follow “statutory reporting requirements,” id. at 842, while “physicians exercise enormous discretion,” id. (quoting United States v. Adam, 70 F.3d 776, 782 (4th Cir.1995)).
The Second Circuit similarly rejected an abuse-of-trust enhancement based on statutory reporting requirements. United States v. Broderson, 67 F.3d 452 (2d Cir.1995). The court held that the defendant’s failure to comply with “specific legal obligations,” including the “duty to ... certify that [] information had been accurately provided” did not mean he occupied a position of trust. Id. at 455. The court emphasized that “whatever ‘trust’ [th'e government] placed in Broderson was based strictly on the explicit commands” of two statutes. Id. at 456. ' Here, too, defendants’ “trust” stems from Medicare’s LCD rules, hot from any professional or managerial discretion.
Contrary to the majority, I do not find persuasive the Fifth Circuit’s contrary conclusion. As the majority explains, that court in United States v. Willett, upheld the application of the enhancement to a DME supplier, reasoning that “Medicare relies on the honesty and forthrightness of DME providers in their claim submissions.” 751 F.3d 335, 344 (5th Cir.2014); see also United States v. Miller, 607 F.3d 144, 150 (5th Cir.2010) (upholding application of the enhancement to a supplier because the government “entrusted her to provide good faith, accurate information in seeking reimbursement,” thus giving her the “freedom to commit a difficult-to detect wrong, which is the primary trait of one who holds a position of trust”) (internal quotation marks omitted). The Fifth Circuit ignores that the presence or absence of substantial professional or managerial discretion, conferred by the victim, is now the critical, inquiry under section 3B1.3. As Contreras recognized, honesty and the difficulty of detecting wrongdoing are no longer the primary considerations after the commentary revisions to section 3B1.3. 581 F.3d at 1166.
• V.
The majority attempts to cabin its- expansion of the abuse-of-trust enhancement *1230 by -stating that “[a] contractor does not occupy a position of trust merely by doing business with the government.” Maj. Op. at 1221. The majority’s reasoning, however,, can easily be interpreted to lead to that conclusion. The majority says that “here there is more” than in the average contractor case because “Medicare trusted [defendants] to exercise their professional discretion in providing appropriate medical equipment to individuals who actually needed it and could use it in their homes.” Id. But using the key words “professional discretion” does not make it so. As described above, Medicare entrusts the physician with the discretion to determine medical need and reserves to the supplier only the responsibility' to verify that the physician’s order complies with its regulations.
The majority also relies on the fact that Medicare uses an “honor system” that, depends on suppliers’ forthrightness. Id. As an initial matter," this conclusion erroneously flows from the old interpretation of the Guidelines rejected by Contreras and fails to account for the commentary revisions that make substantial discretion the key factor. More importantly, Medicare is far from the only government agency that relies on an honor system backed up by audits to provide reimbursements. “All taxpayers who' file false tax returns, for example, might be included” under the majority’s" approach because it seems to subject “virtually anyone who is commanded by statute to make an accurate report to the government to be subject to a Section 3B1.3 enhancement.” Garrison, 133 F.3d at 840 (quoting Broderson, 67 F.3d at 455). Thus, in my view, the court’s opinion will lead to a substantial expansion of this enhancement in contravention of the commentary revisions, which purposefully “place[d] a significant limit on the types of positions subject to the abuse-of-trust enhancement.” Contreras, 581 F.3d at 1166 (quoting United States v. West, 56 F.3d 216, 220 (D.C.Cir.1995)).
The majority’s decision to affirm the application of the abuse-of-trust enhancement to defendants relies on a mischarac-terization of the DME supplier’s role in the Medicare reimbursement process. Moreover, it represents a significant expansion of section 3B1.3’s applicability beyond the narrow situations in which this court has previously approved of the enhancement’s application. Because I do not believe Medicare vests substantial professional or managerial discretion in DME suppliers, I respectfully dissent.

. The Wheelchair Seating LCD was admitted at trial as Exhibit 57.

. The majority is correct that, in addition to verifying the physician's 7-Element Order, the supplier determines that the "basic coverage criteria” are met. Maj. Op. at 1221-22. The coverage criteria, however, are largely duplicative of the 7-Element Order, and thus do not require the exercise of substantial discretion. For example, the majority notes that the first criterion is whether the "beneficiary has a mobility limitation that significantly impairs his/her ability to participate in one or more mobility-related activities of daily living.” But this criterion largely mirrors the fourth element in the 7-Element Order: "Pertinent diagnoses/conditio’ns that relate to the need for the POV or power wheelchair.”

. The funding process for such projects as outlined in Aubrey was complex. First, the Department of Housing and Urban Development ("HUD”) allocated federal money to Indian tribes, there, the Navajo Nation, to fund ' affordable housing construction. Id. at 1119. The Navajo Nation’s Housing Authority, the recipient of the funds, delegated responsibility for disbursing HUD funds for construction work to a series of sub-grantees. The Fort Defiance Housing Corporation (“FDHC”) was one of the relevant sub-grantees. FDHC entered into several development agreements with defendant and his corporations that gave him- the authority to manage a number of housing construction projects. Id. at 1121.