**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
　　　　　*Plaintiff-Appellee,*

　　　　　v.

ADEBOLA ADEFUNKE ADEBIMPE,
　　　　　*Defendant-Appellant.*

No. 14-10303

D.C. No.
4:12-cr-00054-
JSW-2

---

UNITED STATES OF AMERICA,
　　　　　*Plaintiff-Appellee,*

　　　　　v.

PATRICK ADEBOWALE SOGBEIN,
　　　　　*Defendant-Appellant.*

No. 14-10324

D.C. No.
4:12-cr-00054-
JSW-1

---

UNITED STATES OF AMERICA,
　　　　　*Plaintiff-Appellee,*

　　　　　v.

EDUARDO ABAD,
　　　　　*Defendant-Appellant.*

No. 14-10325

D.C. No.
4:12-cr-00054-
JSW-4

OPINION

Appeal from the United States District Court
for the Northern District of California
Jeffrey S. White, District Judge, Presiding

Argued and Submitted
October 20, 2015—San Francisco, California

Filed April 28, 2016

Before: Richard A. Paez, Mary H. Murguia,
and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Murguia;
Dissent by Judge Paez

## SUMMARY[*]

### Criminal Law

The panel affirmed the district court's application of a sentence enhancement pursuant to U.S.S.G. § 3B1.3 for abuse of a position of trust, in a case in which Patrick Sogbein ran a conspiracy to defraud Medicare by providing power wheelchairs to people who did not need them, and his wife, Adebola Adebimpe, participated in the conspiracy by supplying many of the wheelchairs through a medical equipment company that she owned.

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel held that medical equipment suppliers can have the requisite "professional or managerial discretion" for the abuse-of-trust enhancement to apply, if they are responsible for determining the need for the equipment they provide and personally certify the validity of their claims to Medicare.

The panel addressed the defendants' other challenges, and those of a co-defendant, in a separate memorandum disposition.

Dissenting, Judge Paez wrote that durable medical equipment suppliers do not exercise substantial professional or managerial discretion within Medicare's reimbursement scheme because Medicare's rules and regulations confine them to a ministerial role and leave all critical determinations of medical need to the beneficiary's physician.

---

### COUNSEL

Mark D. Eibert (argued), Half Moon Bay, California, for Defendant-Appellant Adebola Adebimpe.

Amitai Schwartz (argued), Law Offices of Amitai Schwartz, Emeryville, California, for Defendant-Appellant Patrick Sogbein.

Christopher J. Cannon (argued) and Matthew A. Laws, Sugarman & Cannon, San Francisco, California, for Defendant-Appellant Eduardo Abad.

Meredith B. Osborn (argued) and Owen P. Martikan, Assistant United States Attorneys; Melinda Haag, United States Attorney, United States Attorney's Office, San Francisco, California, for Plaintiff-Appellee.

## OPINION

MURGUIA, Circuit Judge:

Patrick Sogbein ran a conspiracy to defraud Medicare by providing power wheelchairs to people who did not need them. Sogbein's wife, Adebola Adebimpe, participated in the conspiracy by supplying many of the wheelchairs through a medical equipment company that she owned. Sogbein and Adebimpe challenge the district court's application of a two-level upward adjustment under section 3B1.3 of the Sentencing Guidelines, after finding the defendants abused a position of trust with respect to Medicare. We hold that medical equipment suppliers can have the requisite "professional or managerial discretion" for the abuse-of-trust adjustment to apply, if they are responsible for determining the need for the equipment they provide and personally certify the validity of their claims to Medicare. *See* U.S. Sentencing Guidelines Manual § 3B1.3 cmt. n.1 (U.S. Sentencing Comm'n 2014). We affirm the district court's application of the abuse-of-trust enhancement in this case.[1]

---

[1] We address the defendants' other challenges to their convictions and sentences, and those of co-defendant Eduardo Abad, in a separate memorandum disposition.

I

Patrick Sogbein owned Debs Medical Distributor ("Debs"), a medical equipment supply company. In order to enroll Debs in Medicare's reimbursement program, Sogbein certified that he knew Medicare's standards, that he would follow the relevant laws and regulations, and that he would not submit fraudulent claims. Sogbein spent a significant amount of time learning Medicare's rules, from attending conferences and training sessions as well as studying the rules on his own time. Sogbein also obtained a state license to operate a Home Medical Device Retail Facility in California.

Since 1995, Sogbein has been married to Adebola Adebimpe. Adebimpe also owned a medical equipment supply company, called Dignity Medical Equipment ("Dignity"). In order to enroll Dignity in Medicare's reimbursement program, Adebimpe was also required to certify that Dignity would only submit valid claims.

In 2006, Sogbein and Dr. Edna Calaustro entered into a conspiracy to defraud Medicare by submitting claims for fraudulent power-wheelchair prescriptions. Dr. Calaustro agreed to prescribe power wheelchairs for Medicare-eligible individuals in San Francisco's Tenderloin neighborhood without performing the medical examinations required to determine whether they needed the wheelchairs. Dr. Calaustro sent the prescriptions to Sogbein, who paid Dr. Calaustro $100 for each prescription. Debs delivered the wheelchairs, and then submitted claims to Medicare through an intermediary, Noridian Healthcare Solutions, L.L.C. ("Noridian"). Sogbein received approximately $3000 from Medicare for each wheelchair, which cost him about $800. All told, Sogbein billed Medicare more than $2.8 million, and

received over $1.5 million from Medicare, before the conspiracy stopped in 2011.

In 2010, Debs' billing practices came under scrutiny from Medicare. Sogbein subsequently sent Dr. Calaustro's wheelchair prescriptions to Adebimpe's company Dignity. Dignity billed Medicare approximately $1.5 million for wheelchairs prescribed by Dr. Calaustro.

Sogbein and Adebimpe were charged in an indictment in 2012 with one count of conspiracy to commit health care fraud under 18 U.S.C. § 1349, and ten counts of health care fraud and aiding and abetting at various dates within the span of the conspiracy under §§ 1347 and 2. A superseding indictment in 2013 added one count against Sogbein for conspiracy to pay and receive kickbacks from a federal health program under §§ 371 and 2.

The case went to trial in October 2013. Jody Whitten, a representative from Noridian, testified as an expert witness about the process of prescribing and submitting claims for power wheelchairs. Whitten testified that, in order to qualify for a particular treatment under Medicare, a patient must meet Medicare's eligibility criteria for the treatment, called "local coverage determinations," or "LCDs." Among other things, the local coverage determinations for the power wheelchairs at issue in this case required that the patient actually have a mobility-related medical issue, and that the patient's residence have doorways and rooms that are large enough for the wheelchairs to pass through. The local coverage determinations thus required that medical equipment suppliers perform home assessments.

Ordinarily, the process of prescribing a power wheelchair starts when a physician determines that a patient needs a mobility device and sends an "order" to a medical equipment supplier.  Whitten explained that the medical equipment supplier then "will assess that patient, and determine what is the best type of mobility . . . equipment that beneficiary needs."  After a medical equipment supplier has assessed the patient, the supplier recommends particular equipment in a "Detailed Product Description" document, which is sent back to the physician.  If the physician agrees with the supplier's recommendation, she will sign the Detailed Product Description and return it to the supplier.  Then the supplier will "need to do a complete assessment of the beneficiary's home, either before or at the time of delivery, to make sure that that chair is going to be able to complete those activities within that beneficiary's home."

Whitten stated that medical equipment suppliers have a responsibility to determine the medical necessity of power wheelchairs, because

> [t]he supplier has to know whether the beneficiary meets the coverage criteria in order to bill it appropriately.  So they have to verify and collect medical records, verify all of the orders and the Detailed Product Descriptions are received in a timely manner, and verify that the home provides enough room.

Equipment suppliers have these responsibilities "[b]ecause they're the ones that are going to get reimbursed" for the equipment.

After a wheelchair has been delivered, the supplier submits a claim to Medicare. In Medicare's claim submission system, suppliers select "modifiers" on the claim to communicate information to Medicare, such as the type of equipment provided or whether the equipment was rented or sold. Suppliers select the "KX modifier" to inform Medicare that the beneficiary meets all of the medical and home environment requirements for the equipment.

Medical equipment suppliers ordinarily submit claims to Medicare without supporting paperwork, such as the doctor's prescription or the supplier's home assessment. Rather than scrutinize the documentation for every claim, Medicare performs random audits. Whitten described this process as an "honor system," explaining that Medicare

> tr[ies] to streamline claim processing as much as possible, because . . . there's thousands and thousands of claims a day that come into our system. So that's where the KX modifier comes into play. If the KX modifier's on the claim, that tells us that the supplier has all of those documents, and that they should be paid appropriately.

With the KX modifier, "that claim can go straight through the system, and process, and pay." The medical equipment supplier, not the doctor, decides whether to put the KX modifier on the claim.

Dr. John Fullerton also testified for the government as a Medicare expert. Dr. Fullerton explained that equipment suppliers perform home assessments, and that the "main goal [of the home assessment] is establishing that that home

environment is safe for the patient to use that assistive device, and . . . has the ability to allow that assistive device to help the patient with their medically related Activities of Daily Living sufficiently." Both the physician and the equipment supplier have responsibility to ensure the patient receives the appropriate equipment; each of them "needs to be able to demonstrate a sufficient packet of information, including the medical information, to support the prescription and the procurement and the delivery of a power wheelchair." Dr. Fullerton emphasized that medical equipment suppliers "absolutely" have the authority to disagree with a physician's prescription, because under this particular framework, "there's an independent responsibility for each side to get it right."

Dr. Fullerton also testified that, after reviewing over 400 files of documents prepared by Dr. Calaustro, Debs, and Dignity for power wheelchair claims, none of the documents indicated that adequate home assessments had been performed. In Dr. Fullerton's opinion, the medical documentation provided by Dr. Calaustro was "woefully inadequate" to support orders for power wheelchairs. Dr. Fullerton stated that, if a medical equipment supplier received documentation as sparse as that provided by Dr. Calaustro, the supplier should not deliver a wheelchair, but rather obtain additional documentation from the physician.

Dr. Calaustro and Mele Saavedra, another of the co-conspirators, cooperated with the government and testified at trial. Dr. Calaustro testified that she asked Sogbein if she should prescribe less expensive treatments for the wheelchair recipients, such as canes or walkers. Sogbein told Dr. Calaustro that she should only prescribe wheelchairs, because Medicare would not pay for canes or walkers. Saavedra, who

received $50 each time she recruited a Medicare-eligible individual to receive a wheelchair, testified that Sogbein would only pay her if she referred patients who wanted power wheelchairs—not walkers, manual wheelchairs, or scooters— because Medicare paid Sogbein less for those other devices.

Several people who received power wheelchairs through the conspiracy testified at trial that they did not need or use them. The recipients testified that nobody had assessed their homes to determine whether their homes could accommodate the wheelchairs. One individual testified that his bathroom was not big enough to accommodate the wheelchair he received.

After a month-long trial, the jury convicted Sogbein and Adebimpe on all counts. The district court sentenced Sogbein to a term of incarceration of 144 months, which was 23 months above his Guidelines range of 97 to 121 months. The court sentenced Adebimpe to 51 months of incarceration, which was the low end of her Guidelines range of 51 to 63 months. In calculating the Guidelines ranges, the district court applied a two-level enhancement to both defendants for their abuse of a position of trust under Sentencing Guidelines section 3B1.3.[2]  The court reasoned that Sogbein and Adebimpe "are owners of Debs and Dignity respectively, and thus occupied positions involving substantial managerial [authority] and in a trust position, vis-a-vis the Medicare program." Reviewing trial testimony and exhibits, the district court found that "Medicare operates on an honor system," and

---

[2] "If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels." U.S. Sentencing Guidelines Manual § 3B1.3.

that Sogbein and Adebimpe "understood their obligations to this by virtue of the certifications that they signed."

## II

"We review a district court's application of an abuse-of-trust enhancement under a two-step analysis." *United States v. Aubrey*, 800 F.3d 1115, 1134 (9th Cir. 2015). First, we review the legal question whether a defendant occupied a position of trust as defined by the Guidelines *de novo*. *Id.* "Then, if we decide that the defendant held a position of trust, we review for clear error the district court's decision whether the defendant's abuse of his position significantly facilitated the offense." *Id.* (internal quotation marks and alterations omitted).

## III

### A

Under section 3B1.3 of the Sentencing Guidelines, a district court may apply a two-level upward adjustment "[i]f the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." "'Public or private trust' refers to a position of public or private trust characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference)." U.S. Sentencing Guidelines Manual § 3B1.3 cmt. n.1. The Guidelines give the following examples where the adjustment applies: "embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination." *Id.*

The Guidelines provide, however, that "[t]his adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors."  *Id.*

Although we have not previously had the occasion to consider the application of the abuse-of-trust enhancement to a Medicare equipment supplier, we do not write today on a clean slate.  In *United States v. Laurienti*, we affirmed the enhancement for a stock broker who sold securities to clients at an inflated price.  731 F.3d 967, 970 (9th Cir. 2013).  We explained that "the presence or lack of 'professional or managerial discretion' represents the decisive factor in deciding whether a defendant occupied a position of trust," and that "[a] defendant has this discretion when, because of his or her special knowledge, expertise, or managerial authority, [he or she] is trusted to exercise substantial discretionary judgment that is ordinarily given considerable deference." *Id.* at 973 (second alteration in original) (internal quotation marks omitted).  We held that, as a stock broker, Laurienti had sufficient professional discretion for the enhancement to apply, because his clients relied on his recommendations to purchase particular securities. *Id.* at 974.

In *Aubrey*, we applied *Laurienti* and affirmed the application of the enhancement for a construction contractor who misappropriated funds from the U.S. Department of Housing and Urban Development.  800 F.3d at 1134.  The funds were intended for the construction of affordable housing units in the Navajo Nation, and were distributed through the Fort Defiance Housing Commission ("FDHC"), a non-profit organization with a fiduciary duty to manage the funds.  *Id.* at 1119–20.  The FDHC had entered into a series of development and consulting agreements with Aubrey, the

contractor, which resulted in Aubrey having practical control over the FDHC's finances. *Id.* at 1120. Reviewing Aubrey's challenge to the abuse-of-trust enhancement, we rejected his argument that he only had managerial authority with respect to his construction company, because "[t]rial evidence supported the conclusion that FDHC delegated financial management of the . . . project to Aubrey's company, that his company then stepped into the shoes of FDHC, and that Aubrey had 'the real authority' at FDHC, because he 'handle[d] all of the finances.'" *Id.* at 1134.

In *United States v. Rutgard*, we upheld the application of an abuse-of-trust enhancement to the sentence of an ophthalmologist convicted of Medicare fraud for submitting claims for eye examinations and surgeries that were not medically necessary. 116 F.3d 1270, 1293 (9th Cir. 1997). In doing so, we reasoned that "the government as insurer depends upon the honesty of the doctor and is easily taken advantage of if the doctor is not honest." *Id.* at 1293.

On the other hand, the enhancement is inappropriate where the defendant does not possess the kind of professional discretion on which victims would reasonably rely. For example, in *United States v. Contreras*, we rejected the abuse-of-trust enhancement as applied to a prison cook convicted of smuggling drugs into the prison. 581 F.3d 1163, 1168 (9th Cir. 2009), *opinion adopted in part, vacated in part on other grounds*, 593 F.3d 1135, 1136 (9th Cir. 2010) (en banc). Even though her position as a cook allowed her to commit a difficult-to-detect crime, the cook "held no significant position of authority at [the prison] and exercised no 'professional or managerial discretion.'" *Id.* at 1168.

Other circuits have addressed whether the owners of health care companies occupy positions of trust with respect to Medicare. The Fifth Circuit has repeatedly affirmed the application of the enhancement to owners of medical equipment supply companies convicted of health care fraud. *United States v. Willett*, 751 F.3d 335, 344–45 (5th Cir. 2014); *United States v. Miller*, 607 F.3d 144, 150 (5th Cir. 2010). In *Willett*, the defendant defrauded Medicare by "upcoding," or seeking reimbursements for more money than he was entitled to for the equipment provided. 751 F.3d at 338. The Probation Office recommended applying the abuse-of-trust enhancement "based on Willett's position as a co-owner of a [medical equipment] distributor and his responsibility to submit legitimate and genuine claims to Medicare." *Id.* at 344. "Willett acknowledged that he probably occupied a position of trust," but challenged the district court's factual finding that his abuse of his position substantially facilitated the offense. *Id.* The Fifth Circuit upheld the application of the enhancement, reaffirming a prior holding that "a [medical equipment] provider occupies a position of trust because, in order to provide reimbursements, Medicare relies on the honesty and forthrightness of [medical equipment] providers in their claim submissions." *Id.* at 344–45 (citing *Miller*, 607 F.3d at 150).

However, the Eleventh Circuit has rejected the application of the enhancement for the owner of a health care company that submitted claims for non-allowable expenses to Medicare via an intermediary, Aetna. *United States v. Garrison*, 133 F.3d 831, 841–43 (11th Cir. 1998). The defendant, Garrison, was the owner and chief executive of a health care company that provided in-home nursing services. *Id.* at 833–34. Garrison's company would submit cost reports to Aetna, which reviewed the reports on behalf of Medicare. *Id.*

at 834. Medicare would then reimburse the company for the services it provided that were covered by Medicare. *Id.* However, Garrison instructed her employees to submit cost reports that included expenses that were not reimbursable, such as political contributions and personal vacations. *Id.* at 834–35. Garrison ultimately pled guilty to submitting fraudulent cost reports for Medicare reimbursement.[3] *Id.* at 835.

The district court applied the abuse-of-trust enhancement to Garrison. *Id.* at 837. The Eleventh Circuit reversed. *Id.* at 841–42. The Eleventh Circuit distinguished "arm's-length business relationships," where the enhancement is not available, from cases where "the *defendant has abused discretionary authority entrusted to the defendant by the victim,*" and where the enhancement properly applies. *Id.* at 839 (citation omitted). The Eleventh Circuit held that the relationship between Garrison and Medicare lacked the sufficient element of "trust," for two reasons. First, Aetna was a "fiscal intermediary whose specific responsibility was to review and to approve requests for Medicare reimbursement before submitting those claims to Medicare for payment." *Id.* at 841. Second, as a high-level executive, Garrison was removed from the process of preparing and submitting the cost reports. *Id.* "Garrison lacked the discretion and ability to conceal the false cost reports submitted for Medicare reimbursement and relied on others to accomplish this deception," for example by retaining

---

[3] Like Sogbein, Garrison was charged with conspiracy to defraud the United States under 18 U.S.C. § 371. 133 F.3d at 835 n.8. However, unlike Sogbein, Garrison was charged with making false statements under § 1001, rather than health care fraud under § 1347. *Id.*

financial and legal experts who could hide the improper costs. *Id.* at 841 & n.19.

B

In the case before us, the district court correctly determined that, as medical equipment suppliers, Sogbein and Adebimpe were in positions of trust with respect to Medicare. Medicare entrusted the defendants with "substantial discretionary judgment" in selecting the proper equipment, and gave them "considerable deference" in submitting claims that accurately reflected patients' medical needs through an automated reimbursement system. *See* U.S. Sentencing Guidelines Manual § 3B1.3 cmt. n.1.

The testimony of Noridian representative Jody Whitten and Medicare expert Dr. John Fullerton established that medical equipment suppliers have professional obligations separate from those of a physician. Both witnesses testified that equipment suppliers must determine that a particular piece of equipment is medically appropriate for a beneficiary and that the beneficiary's home is compatible with the equipment. Although the physician ultimately approves the equipment, the supplier must still be able to justify the medical necessity for the equipment, or risk repaying Medicare in the event of an audit. Dr. Fullerton testified that equipment suppliers "absolutely" have authority to disagree with a physician's prescription, and that a supplier who receives inadequate documentation from a physician should contact the physician, rather than deliver the requested equipment.

Other witnesses' testimony established that, within this conspiracy, Sogbein had the discretion to direct the provision

of particular equipment without regard for medical need.  Dr. Calaustro, the physician who prescribed the power wheelchairs, testified that Sogbein instructed her to write prescriptions for power wheelchairs instead of canes or walkers, because Medicare would not pay him for canes or walkers.   Similarly, Mele Saavedra, one of Sogbein's recruiters, testified that Sogbein instructed her to find people who would accept power wheelchairs, and not canes, walkers, or manual wheelchairs, because Medicare would pay him less for those.  Sogbein was not merely processing prescriptions written by Dr. Calaustro; rather, he was affirmatively instructing his co-conspirators to help him deliver a specific, high-cost piece of equipment he selected.

Medicare's electronic claims submission system relies on the supplier's obligation to provide medically appropriate equipment.  Whitten testified that Medicare operates on an honor system because of the thousands of claims it receives every day.   To enroll in this honor system, a medical equipment supplier must certify that it will not submit fraudulent claims.  Claims for reimbursement are processed automatically if a supplier selects the KX modifier on the claim form, indicating that the supplier has determined that the beneficiary meets the requirements for the equipment.

In this case, the automatic nature of the claims submission process, and the limited review performed by the intermediary, Noridian, demonstrate that Sogbein and Adebimpe had primary responsibility for ensuring the validity of the claims they submitted.   Noridian automatically processed claims for payment unless required codes were missing, such as the KX modifier.  As with the construction contractor in *Aubrey*, the mere presence of an intermediary here does not destroy the defendants' position of trust with

respect to Medicare, because Medicare trusted Sogbein and Adebimpe to ensure the validity of the claims they submitted. *See Aubrey*, 800 F.3d at 1134.

In *Rutgard*, we explained that "the government as insurer depends upon the honesty of the doctor and is easily taken advantage of if the doctor is not honest." 116 F.3d at 1293. The same reasoning applies here. The testimony established that Sogbein and Adebimpe occupied a position of trust with respect to Medicare because they had independent obligations to determine that the equipment was appropriate, and they— not Dr. Calaustro—submitted claims to Medicare that they had personally certified to be valid.

This case thus differs from *Garrison*, in which the Eleventh Circuit held that the presence of Aetna as a fiscal intermediary that reviewed the validity of Medicare claims prevented the defendant healthcare executive from occupying a position of trust. 133 F.3d at 841. Here, by contrast, Noridian processed Debs' and Dignity's certified claims as a matter of course, rather than scrutinizing their validity. Also, Garrison, an executive removed from the cost reporting process, relied on others, including financial and legal experts, to conceal improper expenses in the cost reports submitted to Aetna and Medicare. *Id.* at 841 & n.19. Here, Sogbein and Adebimpe personally certified the validity of their claims, and knowingly submitted claims falsely indicating that the beneficiaries met all of the requirements for power wheelchairs.

A contractor does not occupy a position of trust merely by doing business with the government. But here there is more. Medicare trusted Sogbein and Adebimpe to exercise their professional discretion in providing appropriate medical

equipment to individuals who actually needed it and could use it in their homes. Medicare also created a payment mechanism—an honor system—through which equipment suppliers that certified the validity of their claims could receive streamlined reimbursement, and Sogbein and Adebimpe enrolled in and used that system. The defendants' role in this case qualified as a position of trust under Guidelines section 3B1.3.

C

The dissent views the record differently. In concluding the equipment suppliers here lacked the requisite professional discretion for the enhancement to apply, the dissent argues that a supplier's role in determining medical need is limited to verifying that the physician has completed a face-to-face evaluation and seven-element order, and measuring the beneficiary's home—tasks the dissent describes as "ministerial." Dissent at 31–32. According to the dissent, "[i]n essence, the supplier compares the physician's order with the detailed checklist laid out in the LCD." Dissent at 30. The dissent characterizes the supplier's role as merely "reporting" to Medicare that the physician has checked all of the procedural boxes, without independently reviewing the substance of the physician's medical need determination. Dissent at 35–36.

The record demonstrates that the role of the suppliers in this case was not so limited. Both the structure and substance of the local coverage determinations for a power wheelchair require the supplier to exercise discretion. The "LCD Information" section explains that a power wheelchair is only covered by Medicare if the "basic coverage criteria" are met. The first basic criterion is that "[t]he beneficiary has a

mobility limitation that significantly impairs his/her ability to participate in one or more mobility-related activities of daily living." The question for the power wheelchair supplier is whether the coverage criteria are met, not merely whether the physician has provided a seven-element order and examination report.

Other coverage criteria require the power wheelchair supplier to exercise judgment regarding the beneficiary's use of the wheelchair in the home. A power wheelchair is only covered if "[t]he beneficiary's home provides adequate access between rooms, maneuvering space, and surfaces for the operation of the power wheelchair that is provided." The LCD does not define how much space is "adequate." Another criterion is that "[u]se of a power wheelchair will significantly improve the beneficiary's ability to participate in [certain mobility-related activities] and the beneficiary will use it in the home." Whether the coverage criteria are met for a particular beneficiary requires a determination that the power wheelchair will actually help the beneficiary in the home—not whether a physician has decided that it will.

In a later section, "General Information," the LCD explains that "[i]t is expected that the beneficiary's medical records will reflect the need for the care provided." Among other things, the supplier is supposed to collect the physician's seven-element order and the report from the physician's face-to-face examination with the patient. The LCD provides a list of details that the examination report "should provide," but also notes that the report "may include other details," and that "[e]ach element would not have to be addressed in every situation"—without explaining when particular elements are or are not required. Instead of setting forth a hard-and-fast checklist of required content, the LCD

provides that "[t]he [physician's] evaluation should be tailored to the individual beneficiary's conditions. The history should paint a picture of the beneficiary's functional abilities and limitations on a typical day."

Separate from the examination report, the LCD also says that "[p]hysicians shall also provide reports of pertinent laboratory tests, x-rays, and/or other diagnostic tests," but it does not specify which tests are required for which diagnoses. The LCD also requires that, "[u]pon request, suppliers shall provide notes from prior visits to give a historical perspective of the progression of disease over time and to corroborate the information in the face-to-face examination," but it does not specify how much information is sufficient to corroborate the face-to-face examination.

In short, the LCD for a power wheelchair puts the essential question the supplier must answer—are the coverage criteria met—in a separate, earlier section from the question of what supporting documents are required. The LCD does not say anywhere that the coverage criteria are met simply because supporting documents are provided; rather, the criteria are met if the beneficiary actually "*has* a mobility limitation," among other things. (Emphasis added.) And even the decision whether the supporting documentation is adequate requires an exercise of discretion, since the LCD allows that "[e]ach element would not have to be addressed in every evaluation." While the LCD provides significant guidance to the power wheelchair supplier, it does not provide a simple checklist that eliminates the supplier's discretion.

The dissent asserts that the supplier's use of the KX modifier, which indicates that all of the LCD coverage

criteria have been met, is not discretionary because the supplier must use the code to obtain reimbursement. Dissent at 31. The dissent fails to recognize the possibility that the supplier has the discretion to not deliver equipment or not seek reimbursement where the coverage criteria have not been satisfied. Moreover, as the dissent acknowledges, the supplier has the choice of using the GA or GY modifiers instead of the KX modifier when the supplier expects that medical necessity has not been shown. Dissent at 29. The fact that suppliers have an incentive to seek reimbursement does not mean that they lack the discretion to decline to file an inadequately supported claim, or decline to represent to Medicare that the coverage criteria have been met.

Our conclusion is supported by the witnesses' testimony at trial. Jody Whitten, the Noridian representative, was asked "does the supplier have any responsibility for determining medical necessity for that power wheelchair?" Whitten responded, "The supplier has to know whether the beneficiary meets the coverage criteria in order to bill it correctly. They need to verify and collect medical records . . . . So, yes, they do." Whitten did not say the supplier has to know that the physician has determined medical need; rather, she said the supplier has to "know" whether the beneficiary "meets" the criteria, indicating the supplier must use judgment. The fact that this determination is made by "verifying" medical records does not mean that the supplier lacks discretion.

Whitten also described power wheelchair suppliers' obligation to perform a Home Assessment to ensure that the beneficiary's home provides adequate space. She indicated that Medicare would not pay a claim for a power wheelchair for which a Home Assessment had not been performed. She explained that it is important that the device provided to the

beneficiary be "appropriate," both for the beneficiary's home and for the beneficiary's size and weight—and she noted that there was some "wiggle room" in this latter determination. Whitten explained that the supplier (not the physician) initially selects the appropriate equipment: suppliers are "pretty knowledgeable on their equipment, [they] will assess that patient, and determine what is the best type of mobility . . . equipment that beneficiary needs." The assessments, evaluations and determinations described by Whitten require professional judgment; they are not "ministerial" activities.

Dr. Fullerton also described the supplier's role in ways that are inconsistent with the dissent's "ministerial" label. Dr. Fullerton repeatedly described the process of justifying the medical need for a piece of equipment as a "collaboration" between the physician and the supplier, where "there's an independent responsibility for each side to get it right."[4] Indeed, Dr. Fullerton testified that a supplier would request more documentation from a physician if the supplier "felt" that the documentation was inadequate, describing an exercise of judgment, not adherence to a checklist.

---

[4] The dissent discounts Dr. Fullerton's testimony because Dr. Fullerton said that suppliers base their decision on the physician's records and physicians have the ultimate responsibility to sign off on the equipment. Dissent at 31–32. But there is no evidence that the physician's ultimate approval of equipment eliminates the supplier's independent responsibility to determine the coverage criteria have been met. Again, suppliers have this responsibility because "they're the ones that are going to get reimbursed" by Medicare for the equipment. The facts of this case demonstrate that Medicare's trust can be abused where both the physician and the power equipment supplier fail to satisfy their independent obligations.

We agree with the dissent that Medicare assigns the physician both the initial and the final responsibility for determining the medical need for a power wheelchair. Moreover, it is clear that power wheelchair suppliers generally rely on medical records prepared by the physician. But that does not mean power wheelchair suppliers lack an obligation to ensure the need for the equipment they provide, or that they do not exercise discretion in meeting that obligation. Medicare expects the power wheelchair supplier to determine a power wheelchair is appropriate for the beneficiary's home and personal circumstances, and to verify medical records actually support a determination of medical need for the equipment. If the equipment is not appropriate or the records do not provide enough support—perhaps because they lack sufficient detail for the supplier to determine medical need, or because inconsistencies in the records raise red flags—the power wheelchair supplier is expected to *exercise discretion* by not completing the order until enough documentation is provided, or at least by selecting the GA or GZ modifier (indicating that medical necessity has not been shown), instead of KX (indicating that all of the coverage criteria are satisfied).

Finally, the dissent argues that our decision will greatly expand the reach of the enhancement, potentially including individuals convicted of tax fraud. Dissent at 37. If the record were as the dissent reads it, this may be a valid concern. However, as we have emphasized, power wheelchair suppliers do not merely "report" to Medicare that physicians have filled out the proper paperwork. Instead, power wheelchair suppliers are only supposed to submit a claim for equipment with the KX modifier if they are satisfied that the claim is appropriate and adequately justified by medical need. The power wheelchair supplier's decision

requires professional judgment, distinguishing this case from that of the ordinary taxpayer.

IV

We also hold that the district court did not clearly err in finding that Sogbein's and Adebimpe's abuse of their position of trust "significantly facilitated the commission or concealment of the offense." *See* U.S. Sentencing Guidelines Manual § 3B1.3; *see also Aubrey*, 800 F.3d at 1134 (district court did not clearly err in finding contractor's abuse of his position of trust significantly facilitated his offense of misappropriating construction funds, where the contractor shifted the funds among various accounts with little oversight). Sogbein provided individuals with expensive and unnecessary medical equipment without performing the required home assessments. Medicare reimbursed Sogbein at more than three times his out-of-pocket cost for the wheelchairs, totaling payments to Sogbein of more than $1.5 million. And Sogbein was able to obtain these reimbursements with hardly any oversight by enrolling in Medicare's electronic payment system and certifying the validity of his claims.

Once Sogbein's company came under scrutiny from Medicare, he sent Dr. Calaustro's wheelchair referrals to Adebimpe's company, Dignity. Like Sogbein, Adebimpe enrolled her company in Medicare's electronic payment system by certifying the validity of Dignity's claims, allowing the claims to be reimbursed automatically. Adebimpe's abuse of her position of trust allowed Dignity to submit approximately $1.5 million in fraudulent claims to Medicare, again with virtually no oversight.

In light of these facts, the district court's conclusion that Sogbein and Adebimpe's abuse of their positions of trust significantly furthered the offense was not clearly erroneous. *See Aubrey*, 800 F.3d at 1134.

**AFFIRMED**.

---

PAEZ, Circuit Judge, dissenting:

I do not agree with the majority that the enhancement for abuse of trust under United States Sentencing Guideline § 3B1.3 applies to Adebimpe and Sogbein's ("defendants") position as durable medical equipment ("DME") suppliers in the Medicare program. In my view, DME suppliers do not exercise substantial professional or managerial discretion within Medicare's reimbursement scheme because Medicare's rules and regulations confine them to a ministerial role and leave all critical determinations of medical need to the beneficiary's physician. I recognize that our sister circuits are divided on this issue, *compare United States v. Willett*, 751 F.3d 335 (5th Cir. 2014) (upholding application of abuse-of-trust enhancement to DME supplier) *with United States v. Garrison*, 133 F.3d 831 (11th Cir. 1998) (rejecting application of the enhancement to a supplier), but I find the Eleventh Circuit's approach most persuasive. Therefore, I respectfully dissent from the majority's decision to affirm the district court's application of the abuse-of-trust enhancement.

## I.

In *United States v. Contreras*, we reevaluated our precedent on the abuse-of-trust enhancement in light of the

U.S. Sentencing Commission's revisions to the commentary accompanying section 3B1.3. 581 F.3d 1163 (9th Cir. 2009), *opinion adopted in part, vacated in part on other grounds*, 593 F.3d 1135 (9th Cir. 2010) (en banc). In *Contreras*, we held that the Ninth Circuit's prior emphasis on a defendant's "freedom to commit a difficult-to-detect wrong" was "incompatible" with section 3B1.1's revised commentary, which made the presence of substantial "professional or managerial discretion" the key inquiry. *Id.* at 1165–66. In so concluding, we rejected the district court's application of the enhancement to Contreras, a prison cook who took advantage of the fact that she "could enter the prison without being searched" to smuggle drugs to inmates. *Id.* at 1168. This fact alone "did not demonstrate the necessary discretion" to justify the enhancement, and the court expressed concern that "to hold otherwise would extend § 3B1.3 to virtually every employment situation." *Id.* (internal quotation marks and alterations omitted). As detailed below, the evidence at trial outlining the role of DME suppliers does not demonstrate that they exercise the type of discretion the abuse-of-trust enhancement seeks to capture as interpreted by our opinion in *Contreras*.

## II.

The process by which Medicare reimburses a DME supplier for a power wheelchair is carefully outlined in a document known as the Power Mobility Device Local Coverage Determination (LCD).[1] According to the LCD, the first step is the completion of a "face-to-face examination" between the physician and patient. The physician must document the results of the examination in a detailed report,

---

[1] The Power Mobility Device LCD was admitted at trial as Exhibit 55.

which "should be tailored to the individual beneficiary's condition," "paint a picture of the beneficiary's functional abilities and limitations on a typical day," and generally "contain as much objective data as possible."

If, after the examination, the physician believes that the patient requires a power mobility device, she must complete a "7-Element Order." As the name suggests, these orders have seven specific requirements:

1. Beneficiary's name
2. Description of the item that is ordered. []
3. Date of the face-to-face examination
4. Pertinent diagnoses/conditions that relate to the need for the POV or power wheelchair
5. Length of need
6. Physician's signature
7. Date of physician signature

Although the DME supplier "may provide a template order listing the seven required elements," the supplier is expressly "prohibited from completing any part of it." Only the physician who conducted the examination may prepare the order, which the supplier must receive within forty-five days of the face-to-face examination.

Relying on the physician's order, the supplier prepares a "detailed product description." Although the supplier selects the "specific power mobility device that is appropriate" based on the order, the options are narrowly confined by specific medical requirements. For example, a separate "Wheelchair Seating" LCD provides that a "skin protection seat cushion" is covered only if the beneficiary has one of several specific medical conditions (e.g., a "current pressure ulcer") that the

physician diagnosed.[2]    Moreover, final approval of the specific device selected rests with the physician, who "must sign and date the detailed product description and the supplier must receive it prior to delivery."

As a final step, "[p]rior to or at the time of delivery" of the power mobility device, "the supplier or practitioner must perform an onsite evaluation of the beneficiary's home to verify that the beneficiary can adequately maneuver the device that is provided considering physical layout, doorway width, doorway thresholds, and surfaces."  In other words, Medicare requires confirmation that the device is compatible with the beneficiary's home.

Once this process is complete, the DME supplier submits the claim to Medicare for payment.  The supplier must add one of four "modifier" codes to the claim submission: KX, GA, GY, and GZ.  The GA and GZ modifiers are used where there is "an expectation of a medical necessity denial," while the GY modifier is required when the power mobility device is "only needed for mobility outside the home."  This leaves the KX modifier as the only option when the DME supplier seeks reimbursement for a power wheelchair used within the home and "all of the coverage criteria specified in [the] LCD have been met."

### III.

Unlike the majority, I do not view the DME supplier's role in this process as "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)."  U.S.S.G.

---

[2] The Wheelchair Seating LCD was admitted at trial as Exhibit 57.

§ 3B1.3 cmt. n.1. Most importantly, the supplier is not responsible for "determining the need for the equipment they provide." Majority Opinion ("Maj. Op.") at 4. Rather, the supplier verifies that the *physician* has followed the LCD process by conducting the face-to-face-evaluation and completing the 7-Element Order. In essence, the supplier compares the physician's order with the detailed checklist laid out in the LCD. This does not reflect substantial professional or managerial discretion.[3] Furthermore, any add-ons the supplier might suggest for the device must fit within the parameters of the medically-specific LCD and must be approved for medical need by the physician. Although the supplier may have "some 'wiggle room'" when matching the device to the beneficiary's size and weight, Maj. Op. at 22–23, wiggle room does not rise to the level of the substantial discretion envisioned by the Guidelines. Nor does the supplier's performance of a home visit confer the type of substantial discretion envisioned by the Guidelines. Although some experience with the power mobility devices' sizes and functionality may be helpful, verifying "that the beneficiary can adequately maneuver the device that is provided considering physical layout, doorway width, doorway thresholds, and surfaces" is not a decision that requires "professional or managerial discretion," let alone *substantial*

---

[3] The majority is correct that, in addition to verifying the physician's 7-Element Order, the supplier determines that the "basic coverage criteria" are met. Maj. Op. at 19–20. The coverage criteria, however, are largely duplicative of the 7-Element Order, and thus do not require the exercise of substantial discretion. For example, the majority notes that the first criterion is whether the "beneficiary has a mobility limitation that significantly impairs his/her ability to participate in one or more mobility-related activities of daily living." But this criterion largely mirrors the fourth element in the 7-Element Order: "Pertinent diagnoses/conditions that relate to the need for the POV or power wheelchair."

discretion.  Finally, the fact that suppliers must "personally certify the validity of their claims to Medicare" is not a discretionary decision when the supplier has to select the KX modifier in order to receive reimbursement.  Although Medicare may rely on the honesty of DME suppliers who enter KX on their claims, such reliance does not transform the decision to enter that code into a discretionary one.  A decision not to seek reimbursement because the coverage criteria are not satisfied is not discretionary; it is the only decision allowed under the LCD.

The majority's attempts to magnify the role of a DME supplier do not accurately reflect the LCD requirements or the testimony at trial.  For example, the majority describes Jody Whitten, the Noridian representative, as testifying that "medical equipment suppliers have a responsibility to determine the medical necessity of power wheelchairs[.]" Maj. Op. at 7.  But Whitten never said that the supplier *determines* medical need; rather, she testified that the supplier has to "*verify* and collect medical records, *verify* all the orders and Detailed Product Descriptions are received in a timely manner, and *verify* that the home provides enough room." This verification is important, but it is ministerial in nature— only the physician is entrusted with the discretionary medical need determination under the LCD regulations.  Nor does the supplier exercise professional discretion by sometimes producing, upon Medicare's request, physician notes to corroborate laboratory results, diagnostic tests, or the findings of the physician's face-to-face examination.  Maj. Op. at 21.

Similarly, the majority points to the testimony of Dr. John Fullerton, the government's Medicare expert, who stated that a supplier can "absolutely" question a physician's order because both have an "independent responsibility . . . to get

it right." When pressed, however, on the supplier's so-called "independent responsibility," Dr. Fullerton stated only that the supplier must "look[] back at the physician and get[] physician records." He acknowledged that "ultimately, it's the physician who's responsible for signing off on the type and the accessories" for a power wheelchair.

The majority's analysis is also flawed because it relies on the defendants' fraudulent behavior to establish that they occupied a position of trust. For example, the majority explains that "Sogbein was not merely processing prescriptions written by Dr. Calaustro; rather, he was affirmatively instructing his co-conspirators to help him deliver a specific, high-cost piece of equipment he selected." Maj. Op. at 17. But the fact that Sogbein directed Dr. Calaustro to write prescriptions regardless of medical need is the fraudulent conduct for which he was convicted. By instructing Dr. Calaustro, he went beyond his authority as a supplier and usurped the discretion that Medicare gives to physicians. This is grounds for a fraud conviction, but not for the enhancement. Similarly, as further evidence of supplier discretion, the majority points to Dr. Fullerton's testimony that if a DME supplier receives the kind of "woefully inadequate" documentation for an order that Dr. Calaustro provided, the supplier should request more documentation rather than deliver the order. Maj. Op. at 9. Again, however, defendants' failure to request additional documentation was part of the underlying fraud in this case, rather than a legitimate exercise of discretion approved of by Medicare.

To apply the abuse-of-trust enhancement, there must be more than a modicum of discretion—there must be substantial professional or managerial discretion inherent in the role occupied by the defendant. *See Contreras*, 581 F.3d

at 1168. That discretion is absent here. Medicare has carefully circumscribed DME suppliers' role in the supplying of power mobility devices, entrusting the critical, discretionary decisions to physicians that have the professional skill and training to determine a beneficiary's medical need. Verifying the physician's order, confirming the device is usable in the beneficiary's home, and applying the KX modifier to indicate that all Medicare criteria have been met, while important tasks for the processing of power mobility device claims, are ministerial in nature and do not require substantial discretionary judgment as required by section 3B1.3.

## IV.

## A.

Every Ninth Circuit case that has affirmed the application of the enhancement involved a defendant with substantial discretion that went well beyond the ministerial tasks that Medicare delegates to suppliers. In *United States v. Laurenti*, we affirmed the enhancement as applied to a stock broker based on the "professional discretion Laurenti exercised in selecting which securities to recommend, and the deference his recommendations received in light of his special knowledge and expertise" in the field. 731 F.3d 967, 974 (9th Cir. 2013). Laurenti's provision of "investment advice" and ability to "identify securities that would further his [client's] objectives," *id.*, is a far cry from defendants' obligation to verify that each physician report contains Medicare's seven required elements and that each beneficiary's home is large enough to accommodate a power wheelchair.

Nor is the supplier's role comparable to the defendant's in *United States v. Aubrey*, 800 F.3d 1115 (9th Cir. 2015). In that case, the defendant "controll[ed] the entire operations of a non-profit" that constructed housing projects on the Navajo Nation Reservation.[4]  *Id.* at 1134.  While managing those projects, he improperly "shifted" HUD funds "among the various accounts he controlled" with "little oversight" by FDHC, the sub-grantee that supervised Aubrey's work and reimbursed his expenses.  *Id.*  Given those facts, we concluded that Aubrey occupied a position of trust with FDHC.  *Id.*  Here, by contrast, Medicare exercises significant "oversight" over DME suppliers through the LCD rules, which dictate every step the supplier must take to obtain reimbursement.  DME suppliers simply do not exercise the type of freedom in processing power mobility device claims that Aubrey enjoyed over the management of the affordable housing developments.  Further, the discretion vested in defendants over the internal operations of their businesses "carr[ies] no special weight" because that discretion is unrelated to the Medicare claims reimbursement process governed by the LCD.  *United States v. West*, 56 F.3d 216, 221 (D.C. Cir. 1995)

---

[4] The funding process for such projects as outlined in *Aubrey* was complex.  First, the Department of Housing and Urban Development ("HUD") allocated federal money to Indian tribes, there, the Navajo Nation, to fund affordable housing construction.  *Id.* at 1119.  The Navajo Nation's Housing Authority, the recipient of the funds, delegated responsibility for disbursing HUD funds for construction work to a series of sub-grantees.  The Fort Defiance Housing Corporation ("FDHC") was one of the relevant sub-grantees.  FDHC entered into several development agreements with defendant and his corporations that gave him the authority to manage a number of housing construction projects.  *Id.* at 1121.

In the Medicare fraud context, we have determined that physicians occupy a position of trust. *United States v. Rutgard*, 116 F.3d 1270 (9th Cir. 1997). This result is unsurprising given that physicians are explicitly listed in the Guidelines commentary as having the requisite professional discretion to justify the enhancement. Both the patient and Medicare are "easily taken advantage of if the doctor is not honest," *id.* at 1293, because a physician's specialized knowledge allows for obfuscation of wrongdoing. Absent hiring government physicians to re-examine beneficiaries, Medicare has no way to verify that the determinations of medical need are accurate. DME suppliers, by contrast, have the opportunity to commit fraud not because of any professional discretion or expertise, but because the volume of claims submitted to Medicare means the government must rely on supplier certifications and random audits as a check on fraudulent billing.

## B.

Other circuits have recognized that specific statutory obligations do not confer substantial discretion. In *United States v. Garrison*, the Eleventh Circuit refused to apply the enhancement to a DME supplier convicted of Medicare fraud. 133 F.3d 831 (11th Cir. 1998). The court held that Medicare's "statutory reporting requirements do not create a position of trust" in the supplier, *id.* at 841, and distinguished Garrison's lack of discretion from the hypothetical "physician who possesses the expertise to create erroneous medical records and, consequently, fraudulent Medicare reports that are difficult to detect and to question," *id.* at 842. The majority holds that *Garrison* is distinguishable from this case because there the defendant submitted claims to a "fiscal intermediary whose specific responsibility was to review and

approve requests for Medicare reimbursement." *Id.* at 841; Maj. Op. at 14–15, 18.  But even if the fiscal intermediary in *Garrison* had a larger role than Noridian did here, that still leaves the Eleventh Circuit's persuasive reasoning that suppliers simply follow "statutory reporting requirements," *id.* at 842, while "*physicians* exercise enormous discretion," *id.* (quoting *United States v. Adam*, 70 F.3d 776, 782 (4th Cir. 1995)).

The Second Circuit similarly rejected an abuse-of-trust enhancement based on statutory reporting requirements. *United States v. Broderson*, 67 F.3d 452 (2d Cir. 1995).  The court held that the defendant's failure to comply with "specific legal obligations," including the "duty to . . . certify that [] information had been accurately provided" did not mean he occupied a position of trust.  *Id.* at 455.  The court emphasized that "whatever 'trust' [the government] placed in Broderson was based strictly on the explicit commands" of two statutes.  *Id.* at 456.  Here, too, defendants' "trust" stems from Medicare's LCD rules, not from any professional or managerial discretion.

Contrary to the majority, I do not find persuasive the Fifth Circuit's contrary conclusion.  As the majority explains, that court in *United States v. Willett*, upheld the application of the enhancement to a DME supplier, reasoning that "Medicare relies on the honesty and forthrightness of DME providers in their claim submissions."  751 F.3d 335, 344 (5th Cir. 2014); *see also United States v. Miller*, 607 F.3d 144, 150 (5th Cir. 2010) (upholding application of the enhancement to a supplier because the government "entrusted her to provide good faith, accurate information in seeking reimbursement," thus giving her the "freedom to commit a difficult-to detect wrong, which is the primary trait of one who holds a position

of trust") (internal quotation marks omitted). The Fifth Circuit ignores that the presence or absence of substantial professional or managerial discretion, conferred by the victim, is now the critical inquiry under section 3B1.3. As *Contreras* recognized, honesty and the difficulty of detecting wrongdoing are no longer the primary considerations after the commentary revisions to section 3B1.3. 581 F.3d at 1166.

## V.

The majority attempts to cabin its expansion of the abuse-of-trust enhancement by stating that "[a] contractor does not occupy a position of trust merely by doing business with the government." Maj. Op. at 18. The majority's reasoning, however, can easily be interpreted to lead to that conclusion. The majority says that "here there is more" than in the average contractor case because "Medicare trusted [defendants] to exercise their professional discretion in providing appropriate medical equipment to individuals who actually needed it and could use it in their homes." *Id.* But using the key words "professional discretion" does not make it so. As described above, Medicare entrusts the physician with the discretion to determine medical need and reserves to the supplier only the responsibility to verify that the physician's order complies with its regulations.

The majority also relies on the fact that Medicare uses an "honor system" that depends on suppliers' forthrightness. *Id.* As an initial matter, this conclusion erroneously flows from the old interpretation of the Guidelines rejected by *Contreras* and fails to account for the commentary revisions that make substantial discretion the key factor. More importantly, Medicare is far from the only government agency that relies on an honor system backed up by audits to provide

reimbursements. "All taxpayers who file false tax returns, for example, might be included" under the majority's approach because it seems to subject "virtually anyone who is commanded by statute to make an accurate report to the government to be subject to a Section 3B1.3 enhancement." *Garrison*, 133 F.3d at 840 (quoting *Broderson*, 67 F.3d at 455). Thus, in my view, the court's opinion will lead to a substantial expansion of this enhancement in contravention of the commentary revisions, which purposefully "place[d] a significant limit on the types of positions subject to the abuse-of-trust enhancement." *Contreras*, 581 F.3d at 1166 (quoting *United States v. West*, 56 F.3d 216, 220 (D.C. Cir. 1995)).

**\*\*\***

The majority's decision to affirm the application of the abuse-of-trust enhancement to defendants relies on a mischaracterization of the DME supplier's role in the Medicare reimbursement process. Moreover, it represents a significant expansion of section 3B1.3's applicability beyond the narrow situations in which this court has previously approved of the enhancement's application. Because I do not believe Medicare vests substantial professional or managerial discretion in DME suppliers, I respectfully dissent.